704 So.2d 756 (1997)
STATE of Louisiana
v.
Walter J. KOON.
No. 96-KA-1208.
Supreme Court of Louisiana.
May 20, 1997.
Opinion On Rehearing June 30, 1997.
*760 John Wilson Reed, New Orleans, for Applicant.
Richard P. Ieyoub, Atty. Gen., Douglas P. Moreau, District Atty., Louis Richard Daniel, Donald J. Wall, Jr., Kay Freet Howell, R. Christopher Nevils, Baton Rouge, for Respondent.
VICTORY, Associate Justice.
Walter J. Koon was indicted by an East Baton Rouge grand jury on three counts of first degree murder for killing his estranged wife, Michelle Guidry Koon, and her parents, Felicie and Richard Guidry, in violation of La.R.S. 14:30. At trial, defendant was found guilty as charged and given the death penalty on each count. This is the direct appeal of his convictions and sentences.[1]
On appeal, defendant relies on eleven assignments of error. We find no merit in any of the assignments and affirm both the convictions and sentences.

FACTS
At noon on March 5, 1993, defendant and a passenger, Sarah Robinson, drove to the Baton Rouge home of his in-laws where his estranged wife was staying. Armed with a semi-automatic pistol, he parked in the driveway, walked through the carport to the backyard, pulled the gun from the waistband of his pants, and shot his wife twice, killing her. Robinson jumped out of the truck and ran into the Guidry home, yelling that defendant had shot Michelle. As Mrs. Guidry began to call 911 for help, defendant entered the home and shot Mrs. Guidry at close range. She died shorty thereafter. Robinson, who had heard defendant enter the house and shoot Mrs. Guidry, hid in the bathroom. Defendant then shot Mr. Guidry twice in the chest and then after he had fallen, moved closer to Mr. Guidry and shot him twice more at close range, killing him.
Defendant left the Guidry home and drove directly to his trailer in Livingston Parish, where he called the Livingston Parish Sheriff's Office and told Detective Kearney Foster he had just killed three people in Baton Rouge. The Livingston Parish police officers arrested him at him home without incident and recovered the murder weapon inside the trailer.

DISCUSSION

GUILT PHASE ISSUES

Admissibility of Statement Made to Baton Rouge Detectives
Defendant contends that it was error to admit defendant's statement to a Baton Rouge police officer, and that the error was not harmless, especially in the penalty phase of the trial.
Defendant made several statements to police regarding his commission of the killings. In addition to his phone call from his trailer to Detective Foster immediately following the shootings wherein he told Detective Foster that he had just killed three people in Baton Rouge and wanted to turn himself in, he talked to Detective Foster by cellular phone while Detective Foster was in route to defendant's trailer and told him there was "one other son-of-a-bitch" who he would have liked to kill. Defendant told Detective Foster he was drinking a beer and Detective Foster said that when he got there, they could all have a beer together.
When the Livingston Parish sheriff deputies arrived at defendant's trailer, defendant *761 emerged from the trailer with three beers and surrendered without incident. Detective Darryl Curtis advised defendant of his rights and defendant signed a consent to search form. The detectives entered the trailer and found the murder weapon. Again, defendant told the detectives that he had killed three people in Baton Rouge.
On the way to the Livingston Parish Sheriff's Office, Detective Norris Hull testified that defendant "just started talking ... and said something to the effect that she'd had pushed him too far and  uh  he said, I went over there and shot her, knocked her down  shot her. I run up again closer and shot her in the back of the head. I shot the lady  the mother-in-law on the phone and at that time the man started running and I shot him." Defendant also said he thought Mr. Guidry might have been going to get a gun.
Detective Haley, who was riding with Detective Hull, testified that defendant said "she had bugged him too much and pushed him too far and he said  uh  I shot her in the back. She fell and I shot her in the head and then he said he shot the lady on the phone and he shot the old man because he thought he was going after a gun." He also testified that defendant had tears in his eyes during the drive.
When they arrived at the Livingston Parish Sheriff's Office, defendant was read his Miranda rights and was not questioned. He asked Detective Haley if he could use the telephone and Detective Haley explained that he could, but Detective Haley would have to accompany him to the booking room where the telephone was located and could not leave him alone. Defendant then called his mother and Detective Haley heard him tell her "Mother, I killed Michelle and her parents and I want you to hear it from me before you hear it from somebody else" and "No, it wasn't an accident. I went there to do it" or words to that effect. All of the above statements made in Livingston Parish were deemed admissible after a motion to suppress and defendant does not contend that the admission of these statements was erroneous.
After defendant arrived in Baton Rouge at around 4:00 p.m., Detectives Larkin and Stelly placed him in an interview room, advised him that he was under arrest for three counts of first degree murder and read him his rights. Defendant indicated that he understood his rights, refused to sign a waiver form and indicated that he did not want to talk to the detectives but wanted a lawyer. After defendant refused to sign the waiver form, the detectives presented a second form, consisting of a page of questions followed by blanks for written answers and purporting to assess an arrestee's level of understanding regarding the just-issued Miranda rights. At some point, defendant and Detective Stelly allegedly became angry at each other and Detective Stelly left the room. Detective Larkin testified that defendant's anger toward Stelly resulted from the tone of voice in which Stelly had read defendant his rights and Stelly was angry because he had just come from the crime scene. At the motion to suppress, Detective Larkin testified that he "proceeded to talk to him ... attempt to help him regain his composure, and calm him down ... explaining to him [how] the young guys are, they don't understand things and they can't deal with older people sometimes... it seemed to have a calming effect that I could relate to the situation easier than Stelly." Detective Larkin testified that in the process of calming him down, he read defendant the questions from the second form, which the defendant answered. The questions and answers were as follows:
When can you have an attorney? Anytime.
Can you have an attorney any time you want to, including right now? Yes.
Can you use my telephone free of charge to call an attorney any time you want to? Yes.
What will happen if you cannot afford an attorney and you want one? Court appoint.
Do you have to answer even one of my questions or say anything to me? No.
What if you start to answer my questions and then you want to stop? Can you stop any time you want to? Yes.
Do you realize that if I am called into court to testify about what both you and I said in *762 here today, I will be placed under oath to tell the complete truth? Yes.
Would you want me to tell the truth or would you want me to lie? Truth.
I will tell the complete truth regardless if it helps or hurts the prosecutor or helps or hurts your side; do you realize that? Yes.

Now that you know all of these rights that you have, do you wish me to continue? No. (Emphasis added.)
However, Larkin testified that defendant's anger had subsided and "he agreed to talk to me. He said I'll tell you, but I'm not going to tell it to you on tape." Larkin went to get Stelly to tell him defendant was going to make a statement. Defendant then proceeded to tell the detectives how he shot his wife from a distance and then walked up to her and shot her in the head, and then that he shot her parents. Detective Larkin then asked him why he killed them and he said "he killed his wife because she wanted  uh  his business  part of the divorce settlement and that was unacceptable" and that "he killed Mrs. Guidry because she was putting Michele up to trying to take his business away from him" and that he killed Mr. Guidry "because he knew he was going for a weapon." Larkin then testified that after defendant calmed down "his emotions changed completely and he was  uh  cold and  uh  not  maybe not proud that he'd done it, but he was satisfied in that he had done it." Defendant denied making any of these statements to Larkin and Stelly.
Defendant argues that the statements made to Detectives Larkin and Stelly were inadmissible under Edwards v. Arizona, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), and prejudicial in the guilt phase in that the statements seriously undermined defendant's defense that he was undergoing withdrawal from drugs and alcohol at the time of the crime and thus did not appreciate what he was doing. He further claims this was prejudicial in the penalty phase in that it destroyed all defense attempts to mitigate the offense as an impulsive act.
Once a suspect in custody expresses a desire, at any stage in the process, to deal with the police only through counsel, all questioning must cease and the accused is not subject to further interrogation until counsel has been made available to him, unless he initiates further communication, exchanges or conversation with the police and validly waives his earlier request for counsel. Edwards v. Arizona, supra, 451 U.S. at 484-485, 101 S.Ct. at 1885; Miranda v. Arizona, 384 U.S. 436, 440-445, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966); State v. Abadie, 612 So.2d 1 (La.1993), cert. denied, 510 U.S. 816, 114 S.Ct. 66, 126 L.Ed.2d 35 (1993); State v. Lee, 524 So.2d 1176 (La.1987). Miranda and Edwards are prophylactic rules designed to protect an accused against the inherently compelling pressures of custodial interrogation, whether by police badgering, overreaching or subtle but repeated efforts to wear down an accused's resistance and make him change his mind. Oregon v. Bradshaw, 462 U.S. 1039, 1044, 103 S.Ct. 2830, 2834, 77 L.Ed.2d 405 (1983); Wyrick v. Fields, 459 U.S. 42, 45-46, 103 S.Ct. 394, 395, 74 L.Ed.2d 214 (1982) (per curiam); Rhode Island v. Innis, 446 U.S. 291, 298-299, 100 S.Ct. 1682, 1688-1689, 64 L.Ed.2d 297 (1980). When a defendant exercises his privilege against self-incrimination, the validity of any subsequent waiver depends upon whether police have "scrupulously honored" his right to cut off questioning. Michigan v. Mosley, 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975). However, police are not obliged to ignore spontaneous and unsolicited statements by someone in custody, as long as those statements do not result from police-initiated custodial interrogation or questioning "reasonably likely to elicit an incriminating response." State v. Ross, 95-1798 (La.3/8/96), 669 So.2d 384, 386 (per curiam). Nor does a previous assertion of the right to counsel bar admission of such statements. Id.
Whether the authorities have "scrupulously honored" an accused's right to silence is determined on a case-by-case basis under the totality of the circumstances. State v. Brooks, 505 So.2d 714, 722 (La.1987); State v. Harper, 430 So.2d 627, 633 (La.1983). When an accused invokes his Miranda right to counsel, the admissibility of a subsequent confession or incriminating statement is determined *763 by a two-step inquiry: (1) did the accused initiate further conversation or communication; and (2) was the purported waiver of counsel knowing and intelligent under the totality of the circumstances. State v. Abadie, supra at 5-6.
The issue in this case is whether, in the process of "calming down" the defendant and going over the second waiver of rights form, Detective Larkin was continuing his interrogation of defendant such that any further statements made by defendant cannot be deemed an "initiation" of further conversation or communication, because the interrogation had never ended. As stated in State v. Abadie, "[i]n order for there to be a valid waiver, the suspect must have `started,' not simply `continued,' the interrogation; for, just as one cannot start an engine that is already running, a suspect cannot `initiate' an on-going interrogation." Id. (citing Michigan v. Mosley, supra). There, we defined "interrogation" as follows:
The term "interrogation" under Miranda refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonable likely to elicit an incriminating response from the suspect. This is an objective test which does not require a determination of the actual perception of the suspect but prohibits police speech or conduct that creates a situation in which the suspect probably will experience the functional equivalent of direct questioning by concluding that the police are trying to get him to make an incriminating response.
Id. (cites omitted).
In this case, it is clear that Larkin knew that his actions in calming Koon down and reading him the second waiver form "was reasonabl[y] likely to elicit an incriminating response." As he testified:
Q. When he asked for a lawyer and Stelly left the room, do you know why Stelly didn't go call for a lawyer for him?
A. No, I don't know why.
Q. Sir?
A. I don't know why.
Q. But he did request one; didn't he?
A. Yes, he did.
Q. But you didn't go get him one?
A. No, we did not.
Q. Why?
A. Because at that point in time the procedure was to do the next procedure which is fingerprinting, get him fingerprinted and transported.
Q. No, the next procedure was to keep him talking with that piece of paper; wasn't it?
A. This was the next procedure, yes.
Q. Even after he asked for a lawyer?
A. Yes.
Because defendant did not reinitiate the conversation but instead the interrogation never ended, the oral statements to Stelly and Larkin should have been suppressed. See Smith v. Illinois, 469 U.S. 91, 105 S.Ct. 490, 83 L.Ed.2d 488 (1984) (where defendant said he wanted an attorney in the middle of receiving his Miranda warnings, but the police officers kept reading the Miranda warnings and finally, when they had concluded, defendant agreed to talk to them, the Supreme Court held that this violated the rule of Edwards v. Arizona because the police officers should have cut off questioning, and evidently discontinued the Miranda warnings, when defendant unambiguously stated that he wanted an attorney).
The State argues that even if the statement should have been suppressed, any error in admitting the statement was harmless. Arizona v. Fulminante, 499 U.S. 279, 311, 111 S.Ct. 1246, 1265, 113 L.Ed.2d 302 (1991) (when reviewing the erroneous admission of an involuntary confession, the appellate court simply reviews the remainder of the evidence against the defendant to determine whether the admission of the confession was harmless beyond a reasonable doubt). An error is harmless if it is unimportant in relation to the whole and the verdict rendered was surely unattributable to the error. State v. Seals, 93-0305, p. 12 (La.11/25/96), 684 So.2d 368, 377, cert. denied, ___ U.S. ___, 117 S.Ct. 1558, 137 L.Ed.2d 705 (1997) (citing State v. Taylor, 93-2201 (La.2/28/96), *764 669 So.2d 364, cert. denied, ___ U.S. ___, 117 S.Ct. 162, 136 L.Ed.2d 106 (1996)). This court has determined that harmless error analysis applies to confessions, taken in violation of Edwards v. Arizona, which are introduced at capital trials. State v. Lee, supra.
Defendant argues that as to the guilt phase, the statement to Larkin and Stelly concerning his reasons for the killings seriously undermined the intoxication/withdrawal defense that defendant did not know, or at least scarcely appreciated, the acts he was committing. However, the proffered defense of intoxication/withdrawal did not rise to the level of a mental disease or defect rendering defendant incapable of distinguishing between right and wrong with reference to the conduct in question. All the psychologists at trial, with the possible exception of Mark Zimmerman (whose testimony is discussed later in this opinion), testified that defendant knew the difference between right and wrong at the time of the commission of the crime. Further, taken together with defendant's other confessions and statements, we conclude that the erroneous admission of the defendant's statement to Detectives Stelly and Larkin was insignificant in relation to the whole of the evidence at the guilt phase and that the jury's rejection of his proffered defenses was surely unattributable to the error.
Defendant also argues that the admission of the statement and Larkin's portrayal of defendant as cold and remorseless was not harmless error with regard to the penalty phase as it counteracted defense efforts to mitigate the offense as an impulsive act brought on by jealously. At trial, the defendant testified that on the day of the murders, he was going to the Guidry's home to give Michelle some money he had collected from the sale of a car. On the way, Sarah Robinson told him that Michelle did not deserve the money because Michelle was having an affair with a certain individual. Defendant also testified that when he arrived at the Guidry home and saw Michelle in the backyard, Mr. Guidry yelled at him through the door "you no good s.o.b. I will kill you." At that point, he testified that he snapped and "all my vision went down to nothing, like I was looking through a porthole or pipe or something and it was just like I was in a dream state. I could see what was going on but I didn't have any control over my actions and I couldn't hear anything."
However, when Sarah Robinson testified, she told the jury that she never told defendant anything on the way to the Guidry home about Michelle having an affair and that while she did hear Mr. Guidry call defendant a son-of-a-bitch, it was after defendant had shot Michelle and Mrs. Guidry. In addition, the jury heard the evidence of defendant's statement to police that he shot Michelle because "she bugged him" and "pushed him too far" and defendant's statement to his mother that it was not an accident, that he had gone there to kill them. This evidence alone, without the statement made to Detectives Larkin and Stelly, proved beyond a reasonable doubt that defendant's act was not an impulsive act committed out of jealousy.
Defendant also argues that Larkin's testimony portraying defendant after his statement as cold and remorseless constitutes reversible error. In State v. Lee, where, as here, the evidence of guilt was overwhelming, we held that defendant's erroneously admitted statement in which he described his conduct with apparent indifference constituted reversible error in the sentencing phase. We held as follows:
There is surely a reasonable possibility that this evidence might have contributed to the jury's decision. Listening to the confession, particularly those portions in which the defendant describes his conduct with apparent indifference, certainly could have led one or more members of the jury to conclude that he felt no remorse for his deeds. A juror listening to the confession also could reasonably be expected to experience strong emotions, ranging from mortification to outrage. Such impressions or emotions could in turn have contributed to the decision of one or more jurors to impose the death penalty.
State v. Lee, supra at 1191.
This case is distinguishable from Lee. Not only is the erroneously admitted statement far less emotionally stirring than the statement *765 in Lee[2], defendant's own testimony at trial portrayed a cold and remorseless killer. He testified as follows:
Q. You didn't like that, the fact that she went back to her parents every time she would leave you, did you?
A. That's the agreement I made with them when I took her away.
* * *
Q. But you didn't like that, did you?
A. It didn't really bother me one way or the other when we broke up.
Q. But after she would be gone for awhile, you didn't like it, did you?
A. It didn't bother me at that point either, as long as they were not interfering. This time they interfered.
Q. By?
A. By telling her if she didn't get a divorce she was not welcome at their house any more.
* * *
Q. What exactly was your relationship with Michelle's parents?
A. It was rather strained when this happened.
Q. Why?
A. Because they always tried to get into our business. They would never leave us alone.
* * *
Q. She was pretty close with her family, wasn't she?
A. Pretty much so.
Q. Including her sisters?
A. Pretty much so.
Q. And you didn't like that did you?
A. It didn't bother me one way or the other. The only time I didn't like her coming into contact was when she would come back and tell me different ways that I should be running our business and taking care of things whenever her parents would put her up to that kind of stuff.
* * *
Q. Have you ever had any bad words with [Mr. Guidry] before?
A. Not real bad words. We had a few arguments.
Q. How would you describe him? Was he a volatile type, jump-in-your face kind of guy?
A. Yes, sir, he was.
Q. He was?
A. If I had to describe him, it would be as a bully.
Q. Mr. Guidry was a bully?
A. Yes, sir.
Q. He tried to bully you around?
A. He tried to bully all his son-in-laws and his daughters around and his grandchildren.
In addition to the above testimony, his other admissible statements to the police regarding his motives are not so different than the erroneously admitted statements. The only statement that differed at all from the admissible testimony was that defendant killed Michelle because she wanted too much property in the divorce settlement. Surely, the jury would not think better of defendant merely because he killed Michelle because "she bugged him." The jury also heard defendant's statement to Detective Foster of the Livingston Parish Sheriff's Department by cell phone that he had killed three people in Baton Rouge and that there was "one other son-of-a-bitch" whom he would have liked to kill. This statement easily could have led the jury to conclude that only did defendant not regret killing his three victims, but only regretted not being able to kill a fourth person. Furthermore, the jury also heard admissible testimony from Donald Hoppe, discussed later in this opinion, that portrayed defendant as cold and manipulative. In light of all the evidence taken as a whole, and especially in light of the fact that the jury heard testimony that defendant shot three people in cold blood and after killing them, regretted that he could not shoot a *766 fourth, we can safely say that there is no reasonable possibility that the statement to Detectives Larkin and Stelly and Larkin's comments about defendant's attitude might have contributed to a juror's decision to impose the death penalty.
Assignment of Error No. I is without merit.

Exclusion of Prospective Jurors
Defendant contends that was error to exclude prospective jurors Harrell and Lewis on Witherspoon/Witt grounds, in violation of Article 798 of the Code of Criminal Procedure and of the defendant's Fifth, Sixth, Eighth and Fourteenth Amendment rights to due process and to a fair and impartial jury.
The State is entitled to the disqualification of a juror whose views on capital punishment "would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." Wainwright v. Witt, 469 U.S. 412, 424, 105 S.Ct. 844, 852, 83 L.Ed.2d 841 (1985); Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968); La. C.Cr.P. art. 798(2)(b)[3]; State v. Roy, 95-0638 pp. 4-5 (La.10/4/96), 681 So.2d 1230, 1234, cert. denied, ___ U.S. ___, 117 S.Ct. 1474, 137 L.Ed.2d 686 (1997). A trial court has great discretion in matters of a juror's fitness to serve and its rulings on challenges for cause will not be disturbed unless the record of voir dire as a whole reveals an abuse of that discretion. State v. Roy, supra.
Under questioning, Ms. Harrell did not say that she could never impose the death penalty but testified as follows:
Well, my attitude toward the death penalty is that  uh  it's  the law requires it if all of these conditions are met, but I don't want to impose it. I don't want to impose it on anybody, personally.... Not because I don't believe it is due `em. do you know what I'm saying? If they're guilty or that they're  that if they are guilty to that extent, they definitely are due it. But I don't want to. I personally do not know if I can do it.... I think the judge can decide it if it's got to be decided. I don't think that you should  I mean, he's got the knowledge. He's got the insight. He's got all the expertise and I, personally  even twelve people, I think that it's wrong to ask somebody  uh  that don't  I mean, that's  I would be helping all of these people to decide to take a man's life and I don't, I don't want to do that.
After further questioning, she agreed that she had an internal conflict that might prevent her from voting for the death penalty even though she might think the death penalty was warranted.
The court granted the state challenge over defense objection, ruling that the juror's views "would substantially impair her from making an impartial decision as a juror in accordance with the instructions and oath that she would be required to take." This ruling is correct. Ms. Harrell's responses reveal an inability to put aside her attitude concerning the death penalty. The record provides no assurance that the juror could fairly carry out her responsibility should the case proceed to the penalty phase.
After providing conflicting answers on the issue, when asked for the last time whether she could ever vote to impose the death penalty, Ms. Lewis responded as follows:

*767 Honestly, me, I wouldn't pay tax dollars on me if I couldn't make, make up my mind totally on what to do. I mean, `cause honestly from my heart, I don't feel  if I had to just sit here and say, guilty or not guilty for something or if somebody murdered, or whatever, yeah, I can look at the news. I can say, yeah, they're guilty according to the evidence that's being brought, you know. But then when it comes to murder, that's a light that goes off in everybody's head because if he murdered and whoever is going to give him the injection is a murderer. You know, it's just a whole lot involved. And I understand the justice system, there's somebody in authority over everybody. But right now, I just can't totally agree with that.
Q. So then you don't know if you could be fair to the state?
A. Thank you.
The court dismissed her for cause without objection from the defense. This ruling is correct, especially in light of her final statement which implied that she could not be fair to the prosecution.
Assignments of Error Nos. VI and VIII lack merit.

Denial of Defense Challenges for Cause
Defendant contends that it was error for the Court to deny the defense challenge for cause of prospective juror Meyers for bias, in violation of Article 797(2), and of the defendant's Fifth, Sixth, Eighth, and Fourteenth Amendment rights to due process and to a fair and impartial jury.
Ms. Meyers testified that she probably had a preconceived notion as to defendant's guilt but that she would rely on what she heard at trial in making her decision. When pressed, she stated that she did not think she could ever vote not guilty.
However, we need not reach the issue of whether failure to dismiss Ms. Meyers for cause was error because the defense did not use all its peremptory challenges. As we stated in State v. Mitchell, in order to prove error warranting reversal of a conviction and sentence, the defendant must show (1) the erroneous denial of a challenge for cause and (2) the use of all peremptory challenges. 94-KA-2078 (La.5/21/96), 674 So.2d 250, 254, cert. denied, ___ U.S. ___, 117 S.Ct. 614, 136 L.Ed.2d 538 (1996) (citing State v. Cross, 93-1189 (La.6/30/95), 658 So.2d 683). Because the defense failed to use all its peremptory challenges, this assignment of error lacks merit.

Admissibility of Statement Made to Sanity Commission Member
Defendant urges that it was error for the trial court to permit Dr. Hippolite Landry to testify as a fact witness as to defendant's statement, elicited in the absence of counsel, that defendant suffered no physical withdrawal in jail.
On April 8, 1993, the public defender requested that a sanity commission be appointed to inquire into the defendant's capacity to assist in his defense and the defendant's mental capacity at the time of the offense. The court appointed Hippolite Landry, the coroner, and F.A. Silva, a psychiatrist, to the sanity commission. Dr. Landry examined defendant on May 19, 1993, in the absence of counsel. The two doctors testified at a pre-trial hearing on July 14, 1993, after which the court found the defendant competent to stand trial. At this hearing, the defendant withdrew his former not guilty plea and entered the dual plea of not guilty and not guilty by reason of insanity.
In the guilt phase of trial, defendant presented evidence that at the time of the killings, he was suffering from withdrawal symptoms from the drug Xanax and from alcohol. On rebuttal, the state called Dr. Landry who testified that defendant understood the difference between right and wrong at the time of the murders. Dr. Landry testified, over defense objection, that chemical dependency was one of the factors he used to make this determination. He testified that at his May 19, 1993 interview with defendant, he asked defendant if he had experienced any symptoms of withdrawal from drug use and defendant answered "no physical withdrawals in jail." Defendant claims that this statement was elicited to rebut the defense that defendant suffered withdrawal at the time of the offense because if he did *768 not suffer withdrawal in jail, surely he could not have suffered withdrawal at the time of the offense. Defendant claims that this statement is inadmissible as counsel was not present at the sanity commission interview and Dr. Landry was testifying as a fact witness.[4]
There is no requirement that defense counsel be permitted to be present during the defendant's examination by a sanity commission as this is not a critical stage of the proceedings. State v. Jones, 359 So.2d 95 (La.1978), cert. denied, 439 U.S. 1049, 99 S.Ct. 727, 58 L.Ed.2d 708 (1978); State v. Breaux, 337 So.2d 182, 185 (La.1976). However, no inculpatory statement made to the examiners is admissible where defendant's guilt or innocence is at issue. Id. Furthermore, a defendant who places his sanity at issue by standing trial on a not guilty and not guilty by reason of insanity plea waives any right to doctor-patient privilege with respect to sanity commission physicians. State v. Berry, 324 So.2d 822 (La.1976), cert. denied, 425 U.S. 954, 96 S.Ct. 1731, 48 L.Ed.2d 198 (1976).
When an accused enters the dual plea he waives the doctor-patient privilege "only as to such information as is genuinely relevant to the narrow issue tendered." State v. Aucoin, 362 So.2d 503, 505 (La.1978). We have held that the doctor-patient privilege is not intended to apply to information or opinions genuinely relevant to the narrow issue of the defendant's mental health or condition when tendered as an issue either at trial or at the penalty phase. State v. Brogdon, 457 So.2d 616, 627-628 (La.1984), cert. denied, 471 U.S. 1111, 105 S.Ct. 2345, 85 L.Ed.2d 862 (1985).
Here, the defense was intoxication/withdrawal and defendant entered the dual plea of not guilty and not guilty by reason of insanity. The defendant had tendered his mental condition at the guilt phase, as well as urged a mental condition short of insanity at the penalty phase. The remark to Dr. Landry related to those narrow issues. It was not an inculpatory statement relating to defendant's guilt or innocence. The defense was therefore not entitled to exclude it.
Assignment of Error No. IX lacks merit.

Jury Charge on Insanity
Defendant argues that the trial court erred in charging jurors at the guilt phase that a mental defect or disease falling short of insanity was not relevant to determining specific intent. The trial court charged the jury as follows:
In determining the question of sanity or insanity of the defendant at the time of the commission of the offense, you must consider all of the evidence bearing on the defendant's mental condition, including the testimony of experts and other witnesses, and the conduct and actions of the defendant.
In considering the defense of insanity, it should be made clear that a mental defect or disorder, which falls short of legal insanity, is not relevant to determining the issue of specific intent. In other words, evidence of a mental defect or disorder which does not rise to the level of actual, legal insanity cannot be used by the jury to negate the offender's specific intent.
Defendant claims that the total exclusion on specific intent of all evidence concerning a defendant's mental diseases, defects, and capacities is wholly arbitrary, illogical, and unreasonable and violates the defendant's rights to present a defense, not to be convicted other than by due process of law and by proof of guilt beyond a reasonable doubt.
This Court has consistently held that a mental defect, disorder or condition short of insanity cannot serve to negate specific intent and reduce the grade of the offense. State v. Deboue, 552 So.2d 355 (La.1989); State v. Lecompte, 371 So.2d 239, 244-245 (La.1978); State v. Weber, 364 So.2d 952, 956 (La.1978); State v. Berry, supra at 825; State v. Rideau, 249 La. 1111, 193 So.2d 264, 271 (1966), cert. denied, 389 U.S. 861, 88 *769 S.Ct. 113, 19 L.Ed.2d 128 (1967). Accordingly, the jury was correctly charged.
Assignment of Error No. XI lacks merit.

PENALTY PHASE ISSUES

Right to Co-Counsel
Defendant claims that he was denied the assistance of co-counsel to which he was entitled, and which he did not knowingly and intelligently waive, which prejudiced him with regard to the penalty phase.[5] Early in the proceedings, defendant became unhappy with the performance of the public defender assigned to the case and filed a pro se motion seeking a replacement. The trial court appointed Kevin Patrick Monahan, an attorney in solo private practice with a lot of experience in handling criminal cases, as lead counsel. The trial court insisted that the public defender remain as associate counsel until Monahan found another co-counsel, stating "I think that it's in your best interest to at least have [the public defender] or somebody else, if Mr. Monahan finds somebody, to help him make decisions, help do legwork, help do some legal research, that type of thing." Monahan found Denise Vinet to act as co-counsel and she was substituted as co-counsel in October of 1993.
On the Monday morning of trial, Monahan announced to the court that co-counsel Vinet was not present and no longer wanted to participate in the matter. Monahan asserted that he did not need Vinet's assistance and he was prepared to try the case alone. Vinet appeared in court the following day and told the judge that she did not think this would be a problem as Monahan had never asked her to do a thing on the case. Monahan additionally indicated that he and defendant had discussed the situation over the past two days. The court summarized developments, then addressed defendant:
[Vinet] then informed Mr. Monahan on Friday that she didn't want to participate anymore. If you feel that she is necessary to your defense, maybe you've interviewed with her, talked with her, maybe she's gathered information that you know about that you would want her to be part of your defense team, then we can do so. I'll order her to be  to do so  to be here. If not, and if you feel comfortable and confident that Mr. Monahan is  uh  adequately prepared and you would have discussed that with him, then you can tell me you don't  you've waived Ms. Vinet's appearance for you. Which one do you want to do?
Koon: I'd rather waive her appearance, your honor.
This Court has long adhered to the view that the better practice is to appoint two attorneys to defend a capital case, allocating specifically to one the principal responsibility for preparing and presenting the defense case at the penalty phase. State v. Williams, 480 So.2d 721, 728, n. 14 (La.1985). This procedure is now provided for in Supreme Court Rule XXXI(J)(1)(a) which states that "[i]n any capital case in which a defendant is determined to be indigent, the court shall appoint no less than two attorneys to represent the defendant." La.S.Ct.Rules, Rule XXXI(J)(1)(a) (Eff. June 1, 1994). However, as other sections of the Rule make clear, this does not give rise to an affirmative right to multiple attorneys in capital trials. See Rule XXXI (R) ("The Rule shall not be construed to confer substantive or procedural rights in favor of any accused beyond those rights recognized or granted by the United States Constitution, the Louisiana Constitution, the laws of the state, and the jurisprudence of the courts." "The system, programs, rules, procedures and standards included in, encompassed by, and resulting from this Rule shall not form a basis for a procedural or substantive attack in any case or proceeding pending or instituted in the Louisiana criminal justice system on or after the date this Rule is promulgated.")
Even if defendant had a right to co-counsel, he waived that right after discussing it with counsel for two days and after an in-court advisement by the judge. The record thus reflects "an intentional relinquishment or abandonment of a known right or privilege," *770 all that is required to demonstrate a knowing and intelligent waiver of the right to counsel. State v. Carter, 94-2859, p. 24 (La.11/27/95), 664 So.2d 367, 385.
Assignment of Error No. IV lacks merit.

Testimony of Psychologist Donald Hoppe
Defendant claims that the testimony of psychologist Donald Hoppe that the defendant was untruthful, unrepentant and manipulative was inadmissible and that reliance on this testimony to support a death penalty violates the defendant's due process and Eighth Amendment rights to a fair and reliable determination.
The defense called psychologist Mark Zimmerman at the guilt phase in support of its intoxication/withdrawal defense. Dr. Zimmerman had evaluated the defendant prior to trial and testified as to his findings, particularly the result of the Minnesota Multiphasic Personality Inventory ("MMPI"). Zimmerman testified that defendant had an addictive personality, being addicted to drugs and alcohol, which also caused a mild brain dysfunction. Based on defendant's testimony that he had little or no alcohol and Xanax on the day of the murders and his sense of being in a tunnel at the time of the offense, Zimmerman expressed the opinion that defendant may have been going through detoxification or withdrawal, and that it was more probable than not that the detoxification affected defendant's ability to distinguish between right and wrong at the time of the shootings.
Defendant scored average-normal on IQ and very high on those sections of the MMPI reflecting addictive personality traits. Zimmerman found no evidence of psychosis or hallucinations. He testified that based on the MMPI scores, defendant was not lying on his answers, that defendant was passive, rather than aggressively violent, that he was prone to being influenced by others and had a strong need to be accepted by others.
The state called clinical psychologist Donald Hoppe in rebuttal. Dr. Hoppe had heard Dr. Zimmerman's testimony and had reviewed the test results, including those from the MMPI, and testified concerning the results of those tests. He then offered rebuttal testimony which the defense admits was proper. He testified that Zimmerman had miscalculated defendant's IQ (it should have been 98 rather than 93), he disagreed with Zimmerman that there was a connection between defendant's mild brain dysfunction and his addictive personality and rejected the term "addictive personality" altogether. He further disagreed with Zimmerman that depersonalization was related to withdrawal or with an individual's ability to distinguish right from wrong. He further criticized Zimmerman for diagnosing defendant's mental state without getting additional information, as drug addicts were generally not reliable in reporting the things that happened to them.
Without objection, Dr. Hoppe then testified to other matters resulting from the MMPI testing that Dr. Zimmerman did not include in his testimony:
[the person] was not so disturbed as to invalidate the test ... [he] is a person who has trouble being honest ... who has trouble telling the truth. He tends to be opinionated... rather narrow minded ... insists on having things go his way, and has no problem with distorting the facts to [help] himself ... this is a person who seems to have some investment in appearing psychologically disturbed ... who may be exaggerating how disturbed he is for some gain.... The profile that was produced by this individual ... suggests that this is a man who is very preoccupied with his physical symptoms and who is psychologically very naive .... [such people] tend to be ... hypochondriacs ... never satisfied.... This profile also suggests that this is a man who is very attention seeking and emotionally very needy .... emotionally very immature ... and who likes to be pampered and babied, and who will go to any means for that to happen.... I agree [with Dr. Zimmerman that this is a man who needs to be accepted] ... [But it is] absolutely not [true that this is a man who will do what others want him to do].... This is a person who has a lot of problems with anger. He probably tends to be largely passive/aggressive, which means that when he's angry, he kinda sits on it and hold[s] it in. But with the right provocation, he can explode very ragefully and *771 very destructively, you know, with, with almost no forewarning. If you have a person [like this] and you give them drugs... then there's potential for this person to become very, very violent ... this is a man who is irritable ... agitated ... tends to act [] out.... The final thing ... in this profile is that this is a man ... who has a strong kind of grudge or resentment. He's blaming. He does not feel that he's responsible for his behavior but ... everybody else [is].
When discussing the depression scale of the MMPI, Dr. Hoppe testified that the scores suggested that "on the day that he took the test, he wasn't feeling particularly sad or guilty or remorseful about anything." Defense counsel objected that Dr. Hoppe was saying that defendant did not have any remorse, but the trial court overruled the objection, ruling that the witness was interpreting the test results and that the state was entitled to give its view of the data as had the defense.
Under cross-examination, Dr. Hoppe conceded that his testimony represented his opinions of test data only; that the MMPI alone should not be used for diagnostic purposes; and that he was not making an evaluation or diagnosis of the defendant nor, in fact, had he reached any conclusion or firm opinions about the defendant at all. He was merely interpreting the test data.
The defense complains that the state used Hoppe's testimony to devastating effect in oral argument at the guilt and penalty phase.[6] The defense argues that it is inadmissible as rebuttal evidence because it did not rebut any of Zimmerman's testimony. We disagree.
Rebuttal evidence is that which explains, repels, disproves or counteracts. State v. Deboue, supra at 362. The defense opened the door to Dr. Hoppe's testimony when it elicited testimony from Dr. Zimmerman that the MMPI data showed defendant's scores on the "lie scale" and the "faking scale" to be within the normal range, that he was passive and that violence was uncommon to him, that he was prone to be influenced by other people, and that he had a strong need to be accepted by other people and was going *772 to do what other people that he saw as important wanted him to do. Dr. Hoppe's testimony merely explained and counteracted this testimony. As such, it was proper rebuttal testimony. Had the defense believed that the state introduced new issues or evidence, it could have attempted to meet that evidence on surrebuttal.[7]
Assignment of Error No. II lacks merit.

Consideration of Aggravating and Mitigating Circumstances
Defendant argues that the jury was repeatedly and wrongly instructed during voir dire that its penalty decision was determined by whether aggravating circumstances "outweighed" mitigating circumstances and that this constitutes reversible error.
The record reveals that five panels of 12 were called for voir dire. The panels were divided into subgroups for detailed questioning on certain issues, including capital punishment. Each subgroup was read a list of statutory aggravating and mitigating circumstances and told that if an aggravating circumstance was found beyond a reasonable doubt, jurors were nevertheless required by law to consider any mitigating factors that have been presented before imposing the death penalty. A few statements were made, by the state, defense and the court, about weighing mitigating and aggravating circumstances to reach a decision on punishment. However, repeatedly and far more prevalent throughout voir dire were the correct statements that the jurors were not to determine sentencing by weighing aggravating and mitigating circumstances, that the decision was not a "numbers game" and that you could impose the death penalty even if you found only one aggravating circumstance and numerous mitigating circumstances, just as you could impose a life sentence even if you found more than one aggravating circumstance and only one mitigating circumstance. Finally, the defense concedes that the jury was correctly charged at the penalty phase with regard to aggravating and mitigating circumstances.[8]
Louisiana is not a weighing state. It does not require capital juries to weigh or balance mitigating against aggravating circumstances, one against the other, *773 according to any particular standard. State v. Hamilton, 92-1919 p. 17-18 (La.9/5/96), 681 So.2d 1217, 1227-1228. Charging jurors that their assessment of aggravating and mitigating evidence must be on a qualitative rather than a quantitative basis comports with Art. 905.3's requirement that capital jurors consider any mitigating circumstances. State v. Sepulvado, 93-2692 p. 15-17 (La.4/8/96), 672 So.2d 158, 168-169, fn. 7 (instruction that jurors "must weight the mitigating factors against the aggravating circumstances that you find," was not incorrect when charges were read as a whole, as the instruction did not tell jurors "to balance the number of mitigating factors against the number of aggravating circumstances ...."), cert. denied, ___ U.S. ___, 117 S.Ct. 310, 136 L.Ed.2d 227 (1996).
There is no question that the attorneys and judge did, over the course of the five-day voir dire, use "weigh against" and "outweigh" in discussing aggravating and mitigating evidence. Yet a reading of the voir dire as a whole fails to support defense contentions that jurors were systematically misinformed about the law or their obligations as capital jurors. The trial court and attorneys did an exemplary job of educating the venire on the intricacies of Louisiana's capital sentencing scheme, the full range of jurors' options and, more particularly, the requirement that aggravating and mitigating circumstances were not to be determined by sheer numbers. There is no support for claims that jurors were repeatedly and wrongly told that mitigating factors had to "outweigh" by number aggravating circumstances found to exist for a life verdict to be returned.
The voir dire and penalty phase jury charges raise an inference that panel members understood that their job was not to count the aggravating and mitigating factors and, depending on the score, decide punishment. Rather, the record supports a conclusion that the jury understood that the weighing it was required to undertake was a qualitative, not quantitative, process.[9]
Assignment of Error No. III lacks merit.

Victim Impact Testimony
Defendant argues that the trial court admitted "victim impact testimony" that went beyond that which is permissible in details and particulars under Article 905.2 and under the Fifth, Eighth, and Fourteenth Amendment rights to due process and to a fair and reliable penalty determination. Defendant argues that the most egregious was the "prolonged dwelling upon the family's place and position with regard to the Catholic Church.[10]"
*774 The state presented only three witnesses at the penalty phase: Richard I. Guidry, Jr., brother of Michelle and son of Mr. and Mrs. Guidry; Arlene Guidry Dickerson, sister of Michelle and daughter of Mr. and Mrs. Guidry; and Alford R. Dickerson, husband of Arlene and son-in-law to the Guidrys. Their combined testimony totalled 21 pages.
Two categories of victim impact evidence are allowed: "(1) information revealing the individuality of the victim; and (2) information revealing the impact of the crime of the victim's survivors." State v. Taylor, supra at 370 (citing Payne v. Tennessee, 501 U.S. 808, 834, 111 S.Ct. 2597, 2614, 115 L.Ed.2d 720 (1991) (Souter, J., concurring)). Concerning evidence relating to the individuality of the victim, we have held:
[S]ome evidence of the murder victim's character and of the impact of the murder on the victim's survivors is admissible as relevant to the circumstances of the offense or to the character and propensities of the offender. To the extent that such evidence reasonably shows that the murderer knew or should have known that the victim, like himself, was a unique person and that the victim had or probably had survivors, and the murderer nevertheless proceeded to commit the crime, the evidence bears on the moral culpability, and is relevant to his character and propensities as well as to the circumstances of the crime.
Id. (citing State v. Bernard, 608 So.2d 966, 972 (La.1992)).
The testimony elicited in this case does not exceed the bounds established above. The testimony shows that defendant knew the victims were unique people with unique characteristics and that they had survivors, but nonetheless proceeded to kill them anyway. As such, these factors are relevant to show defendant's moral culpability, character and propensities, as well as the circumstances of the crimes, precisely the focus of a penalty phase.
Assignment of Error No. V lacks merit.

Aggravating Circumstance that Victims were "Eyewitnesses"
Defendant argues that it was error for the trial court to instruct the jury to amend its verdict to include the word "eyewitness" rather than "witness" and that it was error for the trial court to accept a verdict based on the aggravating circumstance that the defendant had killed an "eyewitness."
When the jury initially returned its verdict at the penalty phase, it listed as one of the aggravating circumstances as to the murders of Felicie Guidry and Richard Guidry that "the victim was a witness to a crime alleged to have been committed by the defendant." The statutory aggravating circumstance, however, requires that the victim be an eyewitness. Over defense objection, the court then instructed the jury as follows:

*775 It's been pointed out to the court that a word is missing from one of the aggravating circumstances that must be found and must be written on the verdict sheet, so the verdict sheet itself is actually not in proper form because of the word that's missing. I'm going to correct the aggravating circumstances ... and charge the jury to return to the jury room to deliberate with an eye to paragraph four in the aggravating circumstance....
The jury then retired for four minutes, and returned with an amended verdict finding the aggravating circumstance that Felicie Guidry and Richard Guidry were each an "eyewitness."
Article 905.4(A)(8) defines an aggravating circumstance as existing when the "victim... was an eyewitness to a crime alleged to have been committed by the defendant or possessed other material evidence against the defendant." We have held that this does not constitute an aggravating circumstance where the victim of the murder cannot be shown to have been an "eye witness" to an earlier independent crime alleged to have been committed by the accused. State v. Loyd, 459 So.2d 498, 504 (La.1984). The state argued that Mr. and Mrs. Guidry were eyewitnesses to their daughter's murder, and that Mr. Guidry was an eyewitness to his wife's murder. Defendant argues that since Michelle was killed outside and Mr. and Mrs. Guidry were killed inside, there is no evidence that they were "eyewitnesses" to Michelle's murder.
We need not reach the issue of whether the evidence showed that Mr. and Mrs. Guidry were "eyewitnesses" to Michelle's murder or whether Mr. Guidry was an "eyewitness" to Mrs. Guidry's murder as the jury also found other aggravating circumstances which support the imposition of the death penalty[11]. The failure of one or more statutory aggravating circumstances does not invalidate others, properly found, unless introduction of evidence in support of the arguably unproved aggravating circumstance interjects an arbitrary factor into the proceedings. State v. Martin, 93-0285 (La.10/17/94), 645 So.2d 190, 201, cert. denied, 515 U.S. 1105, 115 S.Ct. 2252, 132 L.Ed.2d 260 (1995). Here, the evidence that defendant was engaged in the perpetration of an aggravated burglary and knowingly created a risk of death or great bodily harm to more than one person was properly admitted and even if we were to determine that the aggravating circumstance of killing an "eyewitness" failed, it did not inject an arbitrary factor into the proceeding.
Assignment of Error No. X lacks merit.

CAPITAL SENTENCING REVIEW
Article I, § 20 of the Louisiana Constitution prohibits cruel, excessive or unusual punishment. Pursuant to La.C.Cr.P. art. 905.9 and Louisiana Supreme Court Rule 28, this Court reviews every sentence of death to determine if it is constitutionally excessive. In making this determination, the Court considers whether the sentence was imposed under the influence of passion, prejudice or arbitrary facts; whether the evidence supports the jury's findings with respect to statutory aggravating circumstances; and, whether the sentence is disproportionate considering both the offense and the offender.
Defendant is a white male, who was 48 years old at the time of the offenses. He knew his victims, who were his estranged wife, Michelle, and her parents, Felicie and Richard Guidry. Michelle was 38 years old at the time of her death, Felicie Guidry was 68 years old and Richard Guidry was 73. Defendant was honorably discharged from the Army, where he received a GED. He married three times. He had four children by his first wife; one child by his second wife; and none by his third wife, Michelle. Since 1985 he had owned and operated a small-scale asphalt paving company. Defendant had no juvenile record and no felony arrests or convictions as an adult. He did have approximately 12 misdemeanor arrests, primarily traffic related. His IQ was in the *776 normal/average range. No psychosis or neurological deficits were found. Defendant abused alcohol and drugs. The defense psychologist found mild brain dysfunction as the result of years of poly-substance addiction, although the state presented testimony rebutting this finding.

Passion, Prejudice and Other Arbitrary Factors
Defendant argued that a number of matters injected arbitrary factors into the proceedings. These claims were treated under the individual assignments of error, either in this opinion or in the appendix.
In addition, in the Uniform Capital Sentence Report, in response to whether "there was any indication that the jury was influence[d] by passion, prejudice, or any other arbitrary factor when imposing sentence?" the trial judge responded "Yes; the jury revealed great emotion when the video of the immediate crime scene was shown." A video tape film was made of the crime scene at a time when the body of Michelle Koon was still in the back yard and the body of Mr. Guidry was still in the house. The tape was shown at the guilt phase of the trial without objection. However, the cold transcript obviously fails to convey the impact this piece of evidence had on the jurors.
In any event, we find no error as the state is certainly entitled to the moral force of its evidence and postmortem photographs of murder victims are admissible to prove corpus delicti, to corroborate other evidence establishing cause of death, location, placement of wounds, as well as to provide positive identification of the victim. State v. Maxie, 93-2158 (La.4/10/95), 653 So.2d 526, 532, n. 8 (citing State v. Martin, supra); State v. Watson, 449 So.2d 1321, 1326 (La. 1984), cert. denied, 469 U.S. 1181, 105 S.Ct. 939, 83 L.Ed.2d 952 (1985); State v. Kirkpatrick, 443 So.2d 546, 554-555 (La.1983), cert. denied, 466 U.S. 993, 104 S.Ct. 2374, 80 L.Ed.2d 847 (1984). Photographic evidence will be admitted unless it is so gruesome as to overwhelm the jurors' reason and lead them to convict the defendant without sufficient other evidence. State v. Perry, 502 So.2d 543, 558-559 (La.1986), cert. denied, 484 U.S. 872, 108 S.Ct. 205, 98 L.Ed.2d 156 (1987) (cites omitted). There is no indication that happened in this case.

Aggravating Circumstances
Defendant argued that the state failed to prove the aggravating circumstance that Mr. and Mrs. Guidry were "eyewitnesses" to the murder of their daughter or that Mr. Guidry was an "eyewitness" to the murder of Mrs. Guidry. We have found this argument to be without merit as the state clearly proved other aggravating circumstances as to Mr. and Mrs. Guidry, namely: (1) that defendant knowingly created a risk of death or great bodily harm to more than one person and (2) that defendant was engaged in the perpetration of an aggravated burglary. As to Michelle Guidry, the jury properly found the aggravating circumstance that defendant knowingly created a risk of death or great bodily harm to more than one person. The adequately supported finding of the existence of one aggravating circumstance is alone sufficient to uphold the death sentence, as long as the evidence introduced in support of other asserted aggravating circumstances did not inject an arbitrary factor into the sentencing hearing. Evidence relating to the other asserted aggravating circumstances did not inject an arbitrary factor into the hearing.

Proportionality
Federal constitutional law does not require a proportionality review. Pulley v. Harris, 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984). Nonetheless, La.Sup.Ct. Rule 28, § 4(b) provides that the district attorney shall file with this Court a list of each first degree murder case tried after January 1, 1976, in the district in which sentence was imposed. This Court, however, has vacated only one capital sentence on grounds it was disproportionate to the circumstances of the offense and the character and propensities of the offender. State v. Sonnier, 380 So.2d 1 (La.1979).
The state has listed 57 first degree murder cases tried in East Baton Rouge Parish. Of the 57, eight are pending. Of the remaining cases, eight resulted in death penalties. *777 The state argues that three of these cases are most appropriately compared to this one, although we find they are inapposite.[12] This case more closely resembles State v. Lowenfield, 495 So.2d 1245 (La. 1985), cert. denied, 476 U.S. 1153, 106 S.Ct. 2259, 90 L.Ed.2d 704 (1986).
In State v. Lowenfield, the defendant, his girlfriend Sheila Thomas and her young infant moved in together. The relationship was stormy and Thomas soon returned to her mother's home. Defendant held grudges against the family for perceived interference in his relationship with Thomas. One day he armed himself and hid inside Thomas's mother's home. After family members had gathered, Lowenfield suddenly jumped out and began firing, killing Thomas, Thomas's mother and her husband, Thomas's 4-year old child and that child's father. Defendant fled, was later apprehended and returned for trial. Several sanity commissions examined him and he was found competent to stand trial. He pled not guilty, was convicted on three counts of first degree murder and two counts of manslaughter and sentenced to death.
Lowenfield was 28 years old, a native of Guyana, the son of a carpenter and a nurse. He had the equivalent of a 10th grade education and was a trained pipe-fitter. He had no history of psychiatric treatment, and was found to be "angry, primitive, paranoid, and narcissistic." His intelligence was estimated to be in the high/average range. Among the supported aggravating circumstances was a finding that he had knowingly created a risk of death or great bodily harm to more than one person. This Court affirmed his conviction and sentence.
We find that here, especially where the defendant shot and killed three family members in cold blood, the death sentences are not disproportionate to the crime.

DECREE
For the reasons assigned, defendant's conviction and sentence are affirmed for all purposes, except that this judgment shall not serve as a condition precedent to execution, as provided by La.R.S. 15:567, until (a) defendant fails to petition the United States Supreme Court timely for certiorari; (b) that Court denies his petition for certiorari; (c) having filed for and been denied certiorari, the defendant fails to petition the United States Supreme Court timely, under their prevailing rules, for rehearing of denial of certiorari; or (d) that Court denies his application for rehearing.
LEMMON, J., not on panel. Rule IV, Part 2, § 3.

ON REHEARING
VICTORY, Associate Justice.
We grant this limited rehearing to consider defendant's argument that we based our finding that the admission of an inadmissable statement of a Baton Rouge police officer was harmless error on evidence that was never presented to the jury. In our original opinion, we ruled that Detective Larkin's recount of defendant's statement to him, as follows, was inadmissible: "he killed his wife because she wanted  uh  his business  part of the divorce settlement and that was unacceptable" and that "he killed Mrs. Guidry because she was putting Michelle up to trying to take his business away from him" and that he killed Mr. Guidry "because he knew he was going for a weapon." However, after reviewing all the other evidence, we ruled that the admission of this testimony was harmless error.
Defendant points out that part of the evidence supporting this finding was never heard by the jury. At a motion to suppress hearing, Detective Foster testified that defendant told him by telephone that he had *778 just killed three people in Baton Rouge and that there was "one other son-of-a-bitch" who he would have liked to kill. We erroneously relied, in part, on the impact this statement had on the jury in reaching the following conclusion:
In light of all the evidence taken as a whole, and especially in light of the fact that the jury heard testimony that defendant shot three people in cold blood and after killing them, regretted that he could not shoot a fourth, we can safely say that there is no reasonable possibility that the statement to Detectives Larkin and Stelly and Larkin's comments about defendant's attitude might have contributed to a juror's decision to impose the death penalty.
Op. at pp. 765-66.
After reviewing the record and our original opinion, even though the jury did not hear that defendant regretted not having shot a fourth person, we are still satisfied that there is no reasonable possibility that the inadmissible statement and comments might have contributed to a juror's decision to impose the death penalty.
Accordingly, while taking note of the above error in our original opinion, our decision stands and we otherwise deny defendant's application for rehearing.
NOTES
[1] Trial counsel filed seven assignments of error and argued none. Although appellate counsel has specifically abandoned trial counsel's assignments 3, 4, 5 and 7 and considers assignment 1 subsumed into his Assignment of Error No. IX and assignment 6 merged into his Assignment of Error No. X, we have discussed each of these assignments of error in an unpublished appendix, which is attached to this opinion and is a part of the official record.
[2] In Lee, the statement portrayed the defendant as a cold and indifferent killer who described shooting the 15-year-old victim a second time as he lay twitching in a pool of his own blood and even had trouble remembering whether he then raped the boy's mother or sister first. 524 So.2d at 1192.
[3] La.C.Cr.P. art. 798 provides:

It is good cause for challenge on the part of the state, but not on the part of the defendant, that:
(1) The juror is biased against the enforcement of the statute charged to have been violated, or is of the fixed opinion that the statute is invalid or unconstitutional;
(2) The juror tendered in a capital case who has conscientious scruples against the infliction of capital punishment and makes it known:
(a) That he would automatically vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before him;
(b) That his attitude toward the death penalty would prevent or substantially impair him from making an impartial decision as a juror in accordance with his instructions and his oath; or
(c) That his attitude toward the death penalty would prevent him from making an impartial decision as to the defendant's guilt; or
(3) The juror would not convict upon circumstantial evidence.
[4] The defense concedes that it could not bar psychological or psychiatric testimony from a member of a sanity commission it had requested, Buchanan v. Kentucky, 483 U.S. 402, 107 S.Ct. 2906, 97 L.Ed.2d 336 (1987), but distinguishes this testimony claiming it is "factual" testimony.
[5] This error was not objected to and is thus not subject to our review with regard to the guilt phase. State v. Taylor, 93-KA-2201 (La.2/28/96); 669 So.2d 364.
[6] Defendant complains of these portions of the state's closing guilt phase argument:

You heard Dr. Hoppe's testimony about what that test showed about what kind of person he is. Isn't that consistent with what you've heard from him in this trial. Starting with that phony apology to the family over here. When Dr. Hoppe says the test results show he had no remorse. Wanting to place responsibility for these three murders on anybody but him. Let's blame Sarah. Let's blame drugs. Let's blame lack of sleep. Let's blame I'm sick. Let's blame anything but me. Let's say I'm having a bad day. I didn't do it. I didn't mean to do it. Anything but taking personal responsibility for it.
And you heard Dr. Hoppe talk about Mr. Koon having an investment in the outcome of these proceedings. You bet he's got an investment in it. His life is invested in these proceedings.
He has to call these police officers liars. Again, blame it on everybody but me. Don't blame it on me. The cops are lying on me. He has to call them liars because they saw evidence that he was not suffering from any kind of withdrawal and they testified about his condition at the time that they were in contact with him. Everything was perfectly normal. Does that fit into the manipulative pattern of behavior that Dr. Hoppe said you would expect from this man? Of course it does.
Defendant complains of these portions of argument at the penalty phase:
He wasn't having any mental problems. You didn't hear any testimony about him ever receiving treatment for a mental problem ... Knowing what kind of person he is, as you now do, from having heard his testimony and from having heard Dr. Hoppe describe his personality from a test, and did you notice how closely his description of the personality fit with the man that you met when he testified from this witness stand. He wasn't having any mental problems and he was encountering problems no more serious in his life than you or I have encountered in the past that we dealt with, without killing people. This is not a mitigating circumstance in this case.
The offense was committed while the offender was under the influence or under the domination of another person. You heard him testify and you heard Sarah testify. You can say whatever else you want to about her, but when it comes to personality and dynamic emotions she is about as close to zero as I've ever seen. To expect you and to tell you that he was being dominated by this flight effected [sic], obviously not very intelligent woman, when he has the kind of personality that he had, which Dr. Hoppe described as one that needs to dominate and manipulate people, is utterly ridiculous. And it is not a mitigating circumstance in this case....
[7] As a general proposition, only the state has a right to rebuttal. La.C.E. art. 611(E). Nevertheless, when rebuttal goes beyond the usual and injects new issues and evidence into the proceeding, elemental fairness requires that the defense be allowed to meet that showing by adducing additional evidence on point in surrebuttal. A failure to afford a defendant this opportunity has been held to be reversible error. See State v. Harper, supra at pp. 762-63; State v. Harrison, 553 So.2d 422 (La.1989). See also Pugh, Force, Rault & Triche, Handbook on Louisiana Evidence Law, Author's Notes, Note (1) to Article 611(E) (West 1997).
[8] In pertinent part, the trial court charged jurors at the conclusion of the penalty phase:

A sentence of death shall not be imposed unless the jury finds beyond a reasonable doubt that at least one statutory aggravating circumstance exists and, after consideration of any mitigating circumstances, determines that the sentence of death should be imposed.
If you do not unanimously find beyond a reasonable doubt that one of the listed aggravating circumstances exists, then the only sentence[] which you may impose [] is life imprisonment without benefit of probation, parole or suspension of sentence.
If you unanimously find beyond a reasonable doubt that an aggravating circumstance exists, then you must also consider any mitigating circumstances in determining the sentence to be imposed. You must consider and weigh all of the aggravating and mitigating circumstances together in reaching your decision. You may only impose a sentence of death after (1) you unanimously find beyond a reasonable doubt that an aggravating circumstance exists, and (2) you have considered any mitigating circumstances.
* * * * * *
[Court reads lists of statutory aggravating circumstances relied upon by the state and list of statutory mitigating circumstances]
As indicated by the last item on the list, you are not limited to those mitigating circumstances which are specifically enumerated. You must consider any other relevant circumstance which you feel should mitigate the severity of the penalty to be imposed.
Later in its charge, the trial court instructed the jury that:
All twelve of you must agree to return a verdict determining that the defendant be sentenced to death, or to life imprisonment without benefit of probation, parole or suspension of sentence. However, in the event that the jury is unable to unanimously agree on a sentencing determination in this case, then the court shall impose a sentence of life imprisonment without benefit of probation, parole or suspension of sentence.
[9] Even if the occasional misstatements during voir dire of the subgroups are seen as misstatements of law, any error was cured when jurors were properly instructed at the penalty phase. State v. Roy, supra at 1239 (misstatements of law by the prosecutor during voir dire and penalty phase closing argument concerning an unconstitutional presumption on intent struck down by the U.S. Supreme Court were not prejudicial, given that jurors were correctly charged and that it was possible to conclude that the error "was not so dominant that the jurors could not adhere to their charged duty to accept and to apply the law as given by the court.") See also State v. Edwards, 420 So.2d 663, 681 (La.1982) (prosecutor's erroneous statement of law on intent at closing argument cured by requested admonition); State v. Belgard, 410 So.2d 720, 724-725 (La.1982) (prosecutor's erroneous statement of law on intent at voir dire cured by requested admonition and correct instruction); State v. Gutter, 393 So.2d 700, 702-703 (La.1981) (prosecutor's erroneous statement of the law on intent at closing argument cured by requested admonition and correct charge); State v. Holmes, 388 So.2d 722, 727 (La.1980) (district attorney misstated at voire dire the law on intent and the law of principals, error cured by trial court's jury instructions); State v. Burge, 362 So.2d 1371 (La.1978) (prosecutor misstated the law on intoxication and insanity; error cured when jurors were correctly charged).
[10] Defendant complains of the following testimony:

Q. During the time that you and your brothers and sisters were at home, was religion any part of your upbringing?
A. Religion was very paramount.
Q. What religion?
A. We were raised up as Catholics. We have a lot of religious ... two people who were Brothers of the Sacred Heart ... my mother's uncle and my mother's first cousin. My mother also had a priest ... who is not still a priest in Metairie. My grandmother ... was raised by nuns in Donaldsonville before she got married. So the Catholic church was, like, in the family. We were raised up as devout Catholics. What I mean by that is we were front rowers. The first two rows of in the churches were ours.... Ever since the first day we could get in, we were altar boys all through. Robbie was a seminarian and so was I. We both studied to be priests... The Catholic church, the Catholic faith has played a very predominant part in our lives.
* * * * * *
Mother was in church daily. She made her daily masses. She was part of the Christian... Christian Daughters.... Daddy was part of the Knights of Columbus. He was an officer in that. He was in the Usher's Society. He was president of that for one year. They were involved with the church as much as they could.
* * * * * *
Mom and Dad were people who got things done. For example, when Our Lady of Mercy was first getting started, it was nothing except a cow pasture donated by some people.... I remember distinctly daddy was one of the people who got out there and finished building that school. He stayed up all weekend.... I remember when Lady of Mercy was just getting started, church fairs were really big in order to raise money for this or for that. Guess who was intimately involved with the organization in getting everything done? Mom and daddy.
* * * * * *
Q. What kind of guy was Richard Guidry?
A. He was a leader. He was somebody that if you came to their house he went out of his way to make you feel part of the family. You know, he liked to pick on people in a friendly way to relax them and let their guard down. He raised a fine bunch of sons. People throughout the community that as soon as they figured out that I was dating a Guidry, immediately knew him from his leadership in Catholic church organizations and sports.
[11] As to Mr. and Mrs. Guidry, the jury found the following additional aggravating circumstances: "(1) The offender was engaged in the perpetration or attempted perpetration of an ... aggravated burglary; (2) the offender knowingly created a risk of death or great bodily harm to more than one person...."
[12] State v. Robert Wayne Williams, 383 So.2d 369 (La.1980) (robbery/murder in an A & P); State v. Michael Owen Perry, 502 So.2d 543 (La.1986) (Perry killed his parents, a 2-year old cousin and two other cousins who were sleeping, but Perry's demonstrable mental disabilities set his case apart from the instant one); State v. Allen Robertson, 630 So.2d 1278 (La.1994) (defendant broke into the home of an elderly mixed-race couple and robbed and killed them; defendant was black and 21 years old; conviction and sentence reversed; case currently on remand, pending trial).