CANNELLA, Judge.
Defendant, Carlos A. McGrew, appeals from his convictions on two counts of second degree murder and his sentence to life imprisonment on each count. For the reasons which follow, we affirm and remand.
On September 24, 1998, at 11:43 p.m., Dale Frank Savoy (Savoy) and Kevin Der-mody (Dermody) were each shot twice in the head at close range outside of a discount store in a strip shopping mall in Jefferson Parish approximately 20 feet from an E-Z Serve store. The mall is located on the corner of Bannerwood Street and Lapalco Boulevard.
The Defendant and Chattman were charged with two counts of first degree murder, a violation of La. R.S. 14:30. The Defendant pled not guilty to both counts. On March 10, 1999, the trial court severed the trials of the Defendant and Chattman.
On August 14, 1999, after a five day twelve-person jury trial, the Defendant was found guilty of the lesser offenses of two counts of second degree |3murder, a violation of La. R.S. 14:30.1. The Defendant filed a motion for post verdict judgment of acquittal. On August 18,1999, the trial judge denied the motion and the Defendant waived all legal delays and was sentenced on each count to life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence. The Defendant orally moved to appeal his conviction and on that same day he filed a written motion for. appeal.
At the trial, Dr. Fraser McKenzie, an expert in the field of forensic pathology, testified that she performed the autopsies of Savor and Dermody on September 25, 1998. There was no indication that the victims had been in a fight. Savoy had two gunshot wounds to the head. Two projectiles were recovered from his brain. Dr. McKenzie’s examination revealed that the weapon was placed directly on his head at the time of discharge. She identified State’s Exhibits Numbers 19 and 20 as the projectiles which she removed from Savoy. The drug screen revealed a Valium-like drug and marijuana in his body. The cause of death was gunshot wounds to the head, with perforating wounds to the brain. Dermody also had two gunshot wounds to the head. He had two entrance wounds and two exit wounds. One shot was fired between his eyes from a weapon which was within two feet from his head at discharge, while the other shot was fired from a weapon that was placed on his head at the time of discharge. The drug screen indicated the presence of a Valium-like drug, marijuana and cocaine. The cause of death was gunshot wounds to the head, with perforating wounds to the brain.
Lieutenant Steve Buras arrived at the scene of the homicides at approximately 12:45 p.m. He recovered, inter alia, one *784 projectile located in back of a Coke machine near the victims’ bodies, which he identified as State’s Exhibit Number 30. He also obtained the surveillance video of the night of the 14homicide from the E-Z Serve store. There were no eyewitnesses to the shootings.
Danny Rees[1] (Rees) testified that he was employed at a pawn shop located approximately one block from the strip shopping mall where the homicides occurred. On the day of the incident, between 11:00 a.m. and 8:00 p.m., Defendant, one of his regular customers, and William B. Chattman (Chattman), whom he also knew, entered the pawn shop to purchase .38 caliber ammunition. The two men were acting “erratic” and “so out of the ordinary” that Rees told them that he did not have the ammunition, that he had placed an order, and that they should return in a few days. Defendant and Chattman persisted claiming that they needed it for that night. They asked him to either sell or to give them some of his personal ammunition. Chattman did most of the talking, but Defendant also asked for the ammunition. Rees stated that he told the police that there was another man accompanying the two men. He thought the other man was Dalton Batiste [2] (Batiste).
Batiste denied being in the pawnshop. Batiste testified that at the time of the homicides he generally saw Defendant and Chattman on a daily basis. At the time of the homicides, Defendant’s girlfriend and Batiste lived in the same apartment complex. Batiste testified that he now lives at his mother’s house, 416 Melbrook Drive in Gretna, Louisiana. At the time of Defendant’s trial, Batiste had two felony convictions and pending charges' of possession with intent to distribute cocaine and theft, for which the State made no deal with him in exchange for his testimony. Batiste testified that on the day of the homicides, he |Bsaw Defendant and Chattman at his apartment complex between 10:30 p.m. to 11:00 p.m. The two were walking and told him that they were trying to get home to Oakdale Subdivision. At that time Chatt-man lived at 505 Bannerwood Street and Defendant, Batiste believed, lived at 404 Melbrook Drive. Batiste testified that he did not give Defendant and Chattman a ride. According to Batiste, Defendant was carrying a .38 caliber weapon and Chatt-man a .45 caliber weapon.
The police questioned Batiste regarding his whereabouts at the time of the homicides. However, they did not believe that he was a suspect. Batiste testified that in October of 1998 when he spoke to the police, he had not been arrested nor had any charges pending against him.
Keymba Williamson (K. Williamson) and Rossi Thomas (Thomas) testified that around 11:00 p.m. on the night of the homicides, they saw Defendant and Chatt-man walking toward the E-Z Serve store on Bannerwood Street. Thomas estimated that it was between 11:00 p.m. and 11:45 p.m. K. Williamson testified that Defendant and Chattman were walking in the same direction as she was driving. She stated that, although it was dark, there was sufficient lighting and that she had no problems seeing either Defendant or Chattman. She also testified that they were not friends, but she recognized both men from the neighborhood.
K. Williamson testified that at the time she saw the two men, she was approximately 18 to 20 feet away and had ample opportunity to see them. K. Williamson testified that she saw them for approximately one or two seconds as she drove past and that she was positive of their identities. She further testified that the two men were wearing white tee shirts and dark-colored jeans. At trial K. Williamson testified that she did not know whether the two wore short or long |fipants. Previously, at a pre-trial motion hearing K. Wil *785 liamson testified that Defendant and Chattman wore long jeans.
Thomas testified that she was riding in the front passenger seat of the car, that Bannerwood Street is a well-lighted area and that she had no trouble seeing Defendant and Chattman, whom she had seen hundreds of times. Like K. Williamson, Thomas saw Defendant and Chattman approximately two to three seconds, but there was no question in her mind as to the identities of the two men. Thomas also testified that Defendant and Chatt-man were wearing white tee shirts and dark-colored pants. She did not remember whether the pants were long or short.
After driving passed Defendant and Chattman, K. Williamson and Thomas went to the E-Z Serve store on the corner of Lapalco Boulevard and Bannerwood Street and neither saw either Defendant or Chattman at the E-Z Serve store.
Thomas admitted that the area in which she saw the two men walking was dark and that she did not see anything in either of their hands. Thomas admitted that when defense counsel’s investigator interviewed her, she told him that she knew one of the men walking that night as Chattman and did not notice the other person. She explained that she told the investigator that she was only able to identify the Defendant as a person from the neighborhood. However, on redirect examination, she testified there was no question in her mind that the person whom she saw walking with Chattman was the Defendant.
K. Williamson testified that when she entered the E-Z Serve store, the only other people in the store, other than her girlfriends, were Savoy, Dermody and the clerk and that she and her .friends remained inside approximately 10 to 20 minutes. Both K. Williamson and Thomas testified that both Savory and |7Permody were in the store approximately the same period of time. According to K. Williamson, after checking out, Savoy and Dermo-dy headed in the direction of Reality Drive, at the end of the shopping area.
After leaving the E-Z Serve store, the women went to Taco Bell. Neither K. Williamson nor Thomas saw either Chattman or Defendant on Lapalco Boulevard. After leaving Taco Bell they saw ambulances and police as they approached the E-Z Ser-ve store. They stopped, exited the vehicle, and saw Savoy and Dermody lying in a pool of blood in front of the discount store near the E-Z Serve store.
Jodee Bergquist (Bergquist), a technician employed at a veterinary clinic on the corner of Bannerwood Street and Lapalco Boulevard, testified that the E-Z Serve store is adjacent to the veterinary clinic, both businesses within the strip shopping mall. Bergquist testified that the veterinary clinic and the E-Z Serve store were the only stores open at the time of the homicides. Bergquist further testified that at approximately 11:30 p.m. she went outside of the clinic to smoke a cigarette. She saw three young people exit the E-Z Serve store, one person went toward Ban-nerwood Street while the other two, later identified as Dermody and Savoy, walked toward the veterinary clinic. Bannerwood Street is in the opposite direction. The two young men stopped and asked Bergquist about the cats that are always near the doorway of the clinic. They were not perspiring, nor acting in an unusual manner. After a brief discussion, she finished smoking her cigarette and went back inside the veterinary clinic. Bergquist and Dr. Williams, the veterinarian, heard a “pop,” which sounded like gunfire. They went to the front door of the clinic but did not see anything in the parking lot except their two cars and a truck parked in front of the EZ Serve store. | sBergquist and Dr. Williams returned to the interior of the clinic and heard three more “pops.” They assumed that the EZ Serve store had been robbed. They saw a male exit the EZ Serve store, heading away from Banner-wood Street toward the discount store, approximately 20 feet from the clinic. A wall separates the buildings and restricts *786 the view from the clinic to the discount store. Dr. Williams followed the man while Bergquist called 911. She then assisted Dr. Williams in attending to Savoy and Dermody. She identified the two victims as the two young men with whom she had spoken moments before the shooting.
Clifton Hutto (Hutto) testified that, at approximately 11:30 p.m. to 12:00 a.m., he went to the E-Z Serve store across the street from his apartment. When Hutto entered the E-Z Serve store just prior to the shooting, he saw one or two black males standing outside of the store, on the Bannerwood Street side of the building. One person wore a funny hat. Hutto made a purchase and then, as he crossed the street to return home, he heard a gunshot. He ducked behind a dumpster and heard another gunshot from the same location, approximately 100 feet away. A woman approached him and he instructed her to get down so that she would not get shot. Hutto and the woman waited for 30 seconds to two minutes. He saw two people running away. Hutto walked toward the E-Z Serve store to look around and saw the bodies lying on the ground. Hutto did not believe that the person he saw with the funny hat was one of the two runners. He believed the runners wore light-colored clothing, a tee shirt, and knee-length shorts similar to Bermuda shorts. Hutto could not make an identification because the two people running were too far from him. He stated that they appeared to have dark skin. He did not recall anything in their hands.
The two runners were last seen around the edge of the building on Reality 19Drive. Reality Drive is not a through street, but dead-ends into an open field. Across the open field is Timberwood Drive. West of Timberwood Drive is Melbrook Drive. Deputy Davidson testified that at 12:16 a.m. he broadcast a description of a third black male, wearing black shorts and a red shirt, about five feet, nine inches tall, who had been seen with Savoy and Dermody. He broadcast that the person was seen with the two men 30 minutes before the broadcast. In his report, Deputy Davidson gave a description of one of the perpetrators as a black male, about 20 years old, five feet, six inches tall, and weighing approximately 150 pounds. His description of the second suspect was an approximately 20 year old black male, five feet, ten inches tall, and weighing 160 pounds. He radioed that two black males ran west on Lapalco Boulevard, towards Reality Drive.
Lieutenant Maggie Pernia testified that she arrived at the scene around 12:30 a.m. and proceeded to the end of Reality Drive. There was dew on the grass and she saw fresh footprints in the grass where two people had cut across from Reality Drive to Timberwood Drive. She identified State’s Exhibit Number 58, a photograph, as showing the two paths made in the grass. The footprints led to the 300 block of Timberwood Drive.
Sidney Williamson (S. Williamson), K. Williamson’s brother, testified that at the time of the homicides he was visiting his mother at 348 Timberwood Drive. There is street lighting on Timberwood Drive. S. Williamson testified that he saw two men running away from Lapalco Boulevard about 11:00 p.m. or midnight on the night of the homicides. He thought that he recognized one of the individuals as Defendant, whom he had previously seen in the neighborhood. He did not know the identity of the other individual. S. Williamson testified that the Imonly thing he could remember was that the two men were not wearing shirts. The police questioned S. Williamson the following day. The first time he spoke to the police, he did not give them any name. The second time he spoke to the police, he gave them Defendant’s name. He told the police that it looked like the Defendant, but he was uncertain.
On the way home from his mother’s house on the night of the homicides, S. Williamson passed the E-Z Serve store and saw the two victims lying on the ground. He saw his sister drive up to the *787 E-Z Serve store. S. Williamson told his sister that he saw two people running and that he thought one of them looked like the Defendant. Previously at a pre-trial motion hearing, S. Williamson testified that he did not recognize the two runners. He explained that he must have misunderstood the question because he saw a person who looked like the Defendant, but that he did not know for certain that it was him.
On cross-examination, S. Williamson testified that the police would not let him leave after he told them that he could not identify the two runners. He felt that he had to identify someone in response to the officers presenting a photographic lineup to him and that he would not be allowed to leave until he told the police what they wanted to hear. On redirect examination, S. Williamson testified that the police had him listen to his sister’s audiotape recorded statement in which she said that he said he saw the Defendant’s face. He explained that he did not tell this to his sister, but instead told her that he thought it was the Defendant.
Deputy Chris Fischer testified that three days after the homicides, on September 27, 1998, while on patrol at 3:00 to 3:30 a.m., he observed something unusual at the corner of Mount Laurel and Melbrook Streets. There was anJjjapproaching hurricane and the majority of the homes were evacuated. The weather was inclement and he became suspicious when he saw a black male, upon seeing him, attempt to duck behind some bushes. When the officer turned his vehicle onto Melbrook Street, the man ran. The man, now pursued by the officer, ran across the street into the backyard of a residence located at 416 Melbrook Street. Deputy Fischer briefly lost sight of the man and began scanning the backyard with his flashlight. He saw the man crouch between a wheelbarrow and an air-conditioning unit. Deputy Fischer ordered the man to stand with his hands raised and the subject initially refused. Finally, he stood and threw a large, dark object to the ground. The man struck the deputy and refused to place his hands behind his back as instructed. Instead, he walked quickly to the front of the house, knocked on the door, and yelled, “Mom, I’m home. Let me in. Let me in. Let me in.” No one responded and there were no lights and no sound from inside the house. Deputy Fisher needed assistance from another deputy to restrain the subject. After the arrest, a search revealed, inter alia, heroin. After the subject, whom the deputy identified as the Defendant, was placed in the unit, the deputy returned to the backyard to retrieve the discarded object. He discovered a handgun, with the serial number obliterated, in the exact location where the Defendant had crouched. Deputy Fischer identified State’s Exhibit Number 55 as that handgun.
Louise Waltzer (Waltzer), an expert in the field of firearm examination, analyzed State’s Exhibits Numbers 19, 20, and 30, the recovered projectiles. She tested the weapon, States Exhibit Number 55, and her test revealed that State’s Exhibit Number 19 was fired from the recovered weapon. Tests on the remaining projectiles were inconclusive.
LaDeputy Fisher arrested the Defendant and Chattman on September 27, 1998. Lieutenant Pernia obtained two arrest warrants and two search warrants to search the residences of the Defendant and Chattman. Defendant’s residence was 404 Melbrook Drive and Chattman’s residence was 505 Bannerwood Street. At the Defendant’s residence, Lieutenant Pernia seized two pairs of tennis shoes and one pair of black jeans. She also recovered an identification card bearing Defendant’s name and twenty-six .45 caliber Winchester bullets. There was no evidentiary value from the shoes or clothing.
From Chattman’s residence, Lieutenant Pernia seized two pairs of tennis shoes, two pairs of black jeans, a pair of black parachute pants and one (1) .45 caliber bullet. The bullets found at the Defen *788 dant’s residence and the one found at Chattman’s residence were the same caliber and the same make.
On appeal, the Defendant assigns one error. The Defendant contends that the evidence was insufficient to prove beyond a reasonable doubt the elements of the crime of second degree murder.
The Defendant argues that (1) the identifications made by the women should not have been accorded any weight by the jury since they only saw the perpetrators briefly, (2) S. Williamson only testified to a “possible sighting” of him running down the street after the crimes, (3) Rees’ testimony that he and Chattman told him they wanted ammunition for use that night was not worthy of belief, (4) Batiste presented self-serving testimony that he was at Batiste’s apartment complex with a gun within 30 minutes of the homicides, (5) the State’s theory that he walked four miles from Batiste’s apartment within the relevant time frame was an unreasonable inference, and (6) Deputy Fischer’s testimony which is replete with inconsistencies, is not worthy of belief.
| ^Defendant’s argument is that there is insufficient evidence, due to unreliable identifications, inconsistencies in the testimony, and the self-serving testimony of Batiste, to link him to the homicides. We note that the Defendant does not assign as error the failure of the trial judge to grant the motion to suppress the identifications, but instead argues the inadequacy of the identifications to support the verdicts.
In contrast, the State argues that the jury unanimously rejected the Defendant’s hypotheses of innocence and the evidence sufficiently links him to the crimes.
During cross-examination, defense counsel elicited the following inconsistencies in Deputy Fischer’s testimony at the prior pre-trial motion hearing, the trial for the drug offense, and the deputy’s report or affidavit. His report refers to the address as both 413 and 416 Melbrook Street. He also testified previously that the address was 404 Melbrook. However, before trial he returned to the location to verify the address and testified that he had no doubt that the address was 416 Melbrook Street.
Deputy Fischer’s probable cause affidavit states that he saw the suspect throw a weapon, in contrast to his trial testimony that he did not know it was a gun until he returned to the area. He explained that his affidavit was a brief summary of the entire incident.
In his report, Deputy Fischer referenced subject one and subject two as follows, “Observed subject 1 discard a weapon in the rear of the residence. S-2 was found in possession of four dose units of heroin.” He explained that, in another place in the report, he designated S-l as the Defendant and left blank a designation of S-2. Further, he stated that he never saw anyone other than | ¶ ¿Defendant run to the location, nor saw anyone else enter the backyard.
Defense counsel thoroughly cross-examined Deputy Fischer regarding the bushes. Deputy Fischer admitted testifying previously that he believed the Defendant stepped or cut through the bushes, because he argued that no one could step through or cut through those bushes. He agreed that Defense Exhibits Numbers 13 through 18 were photographs that depict the bushes from different angles. Deputy Fischer explained that the subject he saw could have stepped through the bushes or at the beginning of the bushes, by the sidewalk.
The Defendant argues in brief that no one could have stepped through or cut through those bushes without a chainsaw. However, there was no testimony to that effect. Instead, the following colloquy occurred:
Q. Would it be fair to say that nobody is going to cut through, or step through those bushes unless they have a chain saw or a an axe?
A. No, that’s not fair to say.
*789 William Camp Morrison (Morrison), a private investigator hired by defense counsel approximately two months before trial, took photographs at the corner of Mel-brook and Mount Laurel Streets. He identified Defense Exhibit Number 24 as one of the photographs, showing a close-up view of the hedge, which runs the length of Mount Laurel Street on the corner of Mel-brook Street. Defense counsel asked Morrison to attempt cutting through, stepping through, or walking through the hedge depicted in the photographs introduced at trial. Morrison said it was impossible to do so. Although Morrison testified that it was impossible for him to go through the bushes, he attempted to do so approximately eight or nine months after the homicides, not closer to the relevant time period. Additionally, there was no testimony regarding the relative size, and the ability of |1Bthe investigator and the Defendant to go through the bushes. Further, the deputy testified that the Defendant could have gone around the bushes. During closing argument the State argued that the Defendant was small and could have easily bent down to walk through the bushes.
In reviewing challenges to the sufficiency of the evidence, this court must consider “whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.” Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). See also, La.C.Cr.P. art. 821(B); State v. Mussall, 523 So.2d 1305, 1308, 1309 (La.1988). A determination of the weight of evidence is a question of fact, resting solely with the trier of fact who may accept or reject, in whole or in part, the testimony of any witnesses. State v. Silman, 95 0154, p. 12 (La.11/27/95), 663 So.2d 27, 35. A reviewing court may impinge on the fact-finding function of the jury only to the extent necessary to assure the Jackson standard of review. State v. Borde-nave, 95-2328, p. 2 (La.4/26/96), 678 So.2d 19, 20 (quoting Jackson, 443 U.S. at 319, 99 S.Ct. at 2789). It is not the function of an appellate court to assess credibility or reweigh the evidence. Appellate review for minimal constitutional sufficiency of evidence is a limited one restricted by the standard developed in Jackson. State v. Rosiere, 488 So.2d 965, 968 (La.1986) and the cases cited therein.
La. R.S. 15:438 provides that when evidence is circumstantial, the applicable rule is that, “assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence.” In Rosiere, 488 So.2d at 965, 968, the Louisiana Supreme Court explained:
|1fiThis is not a purely separate test from the Jackson sufficiency standard to be applied instead of a sufficiency of the evidence test whenever circumstantial evidence forms the basis of the conviction. Ultimately, all evidence, both direct and circumstantial, must be sufficient under Jackson to satisfy a rational juror that the defendant is guilty beyond a reasonable doubt. Due process requires no greater burden.
The jury apparently attached great weight to the testimony of Deputy Fischer, Rees, Waltzer, Batiste, and the three women who identified defendant as being in the vicinity shortly before the crimes. As stated in State v. Pascual, 98-1052, p. 6 (La.App. 5 th Cir. 3/30/99), 735 So.2d 98, 101:
It is the role of the fact finder to determine the weight of the evidence and the jury may accept or reject, in whole or in part, the testimony of any witness. The appellate courts may not second guess the jury’s rational credibility determinations.
In State v. Williams, 438 So.2d 1212, 1217 (La.App. 3 rd Cir.1983), writ denied, 443 So.2d 590 (La.1983), the defendant asked the court to re-examine the testimony offered to prove the element of specific *790 intent, presented through the testimony of the eyewitness. The court, in noting that there were many inconsistencies in the testimony, concluded that the jury was made well-aware of the witness’ background and of the inconsistencies in her testimony. The court further noted that the witness was put through rigorous examination and cross-examination through which her character was made quite clear to the jury and that the jury evidently believed the witness was truthful regarding the incident. Citing State v. Klar, 400 So.2d 610, 613 (La.1981), the court concluded that the jury’s factual determinations are entitled to great weight and will not be disturbed unless clearly contrary to the evidence. Similarly here, the jury was made aware of inconsistencies in the officer’s testimony, and evidently believed he was truthful in testifying that it was the Defendant he arrested and it 117was Defendant who possessed the weapon.
The only other possible hypothesis of innocence suggested by the Defendant is that Batiste, or another individual, was the shooter. The Defendant argues that since Batiste was present when he and Chatt-man sought to purchase ammunition, since Batiste’s mother lives at the house where the person was trying to enter the night Deputy Fischer arrested him, and since Batiste’s self-serving testimony does not properly exclude the reasonable hypothesis that the Defendant is innocent, he cannot be convicted.
We find that hypothesis of innocence is overcome by a substantial amount of evidence. There is the credibility of Deputy Fischer, who testified that he arrested the Defendant three days after the incident and that the Defendant threw away a gun at the time of his arrest. Also, Waltzer identified the bullet taken from the brain of one of the victims as being fired from that gun, which was a .38 special caliber weapon. The jury gave great weight to the officer’s testimony regarding the arrest and gun and excluded Defendant’s hypotheses of innocence as unreasonable, since neither Batiste, nor any other person, was found in possession of the weapon that fired the bullet that killed one of the victims. Further, the testimony by Deputy Fischer that the person he arrested asked his mother to open the door, does not, in and of itself, negate the reasonable inference that the Defendant was posing as Batiste for the purpose of gaining entry into the residence, thereby seeking to escape or to delay capture.
After viewing the evidence in the light most favorable to the prosecution, we find that a reasonable trier of fact could have excluded every reasonable hypothesis of innocence and found the Defendant guilty of two counts of second degree murder. This assignment of error lacks merit.
haThe record was reviewed for errors patent, according to LSA-C.Cr.P. art. 920; State v. Oliveaux, 312 So.2d 337 (La.1975); and State v. Weiland, 556 So.2d 175 (La.App. 5 th Cir.1990).
Initially, the trial judge informed the Defendant he had three years from the date of sentencing to file post-conviction relief. Thereafter, she added that he had three years from the date the sentence became final. Thus, there is ambiguity regarding the beginning date of the prescriptive period, where the trial judge failed to clearly state the proper requirement that the prescriptive period begins after the judgment of conviction and sentence has become final. La.C.Cr.P. art. 930.8A. Also, at the time the Defendant was sentenced, the prescriptive period had been shortened to two years. State v. Williams, 98 651, pp. 13, 14 (La.App. 5 th Cir. 2/10/99), 729 So.2d 14, 22. Therefore, the case must be remanded to the trial court with instructions to send appropriate written notice to the Defendant of the correct statement of the law regarding the prescriptive period for post conviction relief and to file written proof in the record that he received the notice. See: State v. Kershaw, 94-141 (La.App. 5 th Cir. 9/14/94), 643 So.2d 1289.
*791 Accordingly, for the reasons set forth above, we affirm the Defendant’s convictions on two counts of second degree murder and his two sentences to life imprisonment at hard labor and remand to the trial court.
AFFIRMED AND REMANDED.

. Also spelled Reese in the court transcript.

. Also spelled Baptist in the court transcript.