800 So.2d 1043 (2001)
STATE of Louisiana
v.
William CHATTMAN.
No. 01-KA-556.
Court of Appeal of Louisiana, Fifth Circuit.
October 30, 2001.
*1045 Paul D. Connick, Jr., District Attorney, Churita H. Hansell, Assistant D.A., Terry M. Boudreaux, Assistant D.A., Walter G. Amstutz, Assistant D.A., Gretna, LA, for Plaintiff-Appellee.
Jane L. Beebe, Louisiana Appellate Project, Gretna, LA, for Defendant-Appellant.
Panel composed of Judges EDWARD A. DUFRESNE, JR., THOMAS F. DALEY and MARION F. EDWARDS.
EDWARD A. DUFRESNE, JR., Chief Judge.
The Jefferson Parish Grand Jury returned an indictment charging defendant, William B. Chattman, with two counts of first degree murder, in violation of LSA-R.S. 14:30.[1] However, the state subsequently amended the indictment to charge defendant with second degree murder, a violation of LSA-R.S. 14:30.1. The matter proceeded to trial before a twelve person jury at the conclusion of which defendant was found guilty of both counts of second degree murder. The trial judge sentenced defendant on each count to life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence, to be served concurrently. Defendant now appeals.

FACTS
On the night of September 24, 1998, Dale Frank Savoy and Kevin Dermody were each shot twice in the head at close range outside of a strip shopping mall, approximately twenty feet from an E-Z Serve convenience store. The shopping center is located on the corner of Bannerwood Street and Lapalco Boulevard in Gretna.
The state's witnesses testified at trial about the events leading up to the shooting. Jodee Bergquist, a technician employed at a veterinary clinic adjacent to the E-Z Serve store, saw the victims exit the E-Z Serve, and walk toward the clinic shortly before 11:30 p.m. when she went outside to smoke a cigarette. Ms. Bergquist testified that the young men stopped and asked her about the cats at the clinic. After she finished her cigarette, she returned inside the clinic. Shortly thereafter, Ms. Bergquist heard gunshots, and called the police.
When Ms. Bergquist and Dr. Williams, the veterinarian, walked over to the E-Z Serve, Ms. Bergquist saw that the two young men with whom she had just spoken, were lying on the ground with head wounds. She and Dr. Williams rendered medical assistance to no avail, and the paramedics arrived shortly thereafter.
Lieutenant Maggie Pernia, the officer assigned to this case, watched the surveillance videotape from the E-Z Serve. The tape showed the victims at the counter and some women behind them. During the course of the investigation, the police went *1046 door-to-door in the neighborhood in search of information about the shootings. At a home in the neighborhood, Lieutenant Pernia recognized a young women, Keymba Williamson, as one of the people from the videotape.
Ms. Williamson, and her friend, Rossi Thomas, told police they saw McGrew and defendant at approximately 11:00 p.m. on the night of the shooting. The women testified at trial that they were driving to the E-Z Serve and passed defendant and McGrew walking on Bannerwood Street toward the E-Z Serve store. Both Ms. Williamson and Ms. Thomas said they knew McGrew and defendant from the neighborhood. After passing McGrew and defendant, the women bought some cigarettes at the E-Z Serve, and neither saw McGrew nor defendant again that night.
Ms. Williamson testified that when she entered the E-Z Serve, the only people in the store, other than her girlfriends, were "two white boys" and the clerk. After making their purchases, the young men headed in the direction of Realty Drive, at the end of the shopping area. The women left the E-Z Serve, and went to Taco Bell on Belle Chasse Highway. On their way home from Taco Bell, they saw ambulances and police as they neared the E-Z Serve. They stopped, and saw the two young men they had seen earlier at the E-Z Serve, lying in a pool of blood outside of a discount store next to the E-Z Serve.
Sidney Williamson, Keymba's brother, was driving by the E-Z Serve and saw all the commotion. Mr. Williamson told police that he was at his mother's house in the neighborhood, and saw two men running down Timberwood Street away from Lapalco Boulevard. He later told police that he believed he recognized one of the men as Carlos McGrew, but he did not know the identity of the other man.
During the investigation, the police talked to Dalton Baptiste and Danny Rees, who had both seen McGrew and defendant earlier on the day of the homicides. Mr. Rees worked at B.J.'s Pawn Shop approximately one block from the crime scene. Mr. Rees testified that defendant and McGrew came into the pawn shop between 11:00 a.m. and 3:00 p.m. on the day of the homicides. Chattman was one of his regular customers, who had purchased a gun in the past as well as ammunition. That day, Chattman wanted to buy some .38 caliber ammunition. However, Mr. Rees said Chattman and McGrew were acting so "excited" that it made him nervous. Mr. Rees decided to tell them that he did not have the ammunition, that he had placed an order, and that they should return in a few days. Chattman, however, told Mr. Reese, "No, I need it for tonight." Chattman persisted, and even pressed Mr. Rees to sell them some of his personal ammunition. Further, Mr. Rees stated that he thought he saw Dalton Baptiste's car outside, and believed he saw Baptiste in the car. He said that Baptiste had come into the pawn shop with McGrew and Chattman on previous occasions, but that he did not recall that Baptiste had purchased a gun at the pawn shop. When confronted with a receipt showing that Baptiste had purchased a rifle from the pawn shop in May of 1998, Mr. Rees explained that even though the receipt showed Baptiste purchased the gun, he may not have actually received the weapon if he had not passed the background check.
Baptiste denied he went to the pawn shop that day, and said he had never bought a gun at the pawn shop. Baptiste testified that he had seen defendant and McGrew twice that day. He first saw them at approximately 3:00 p.m. and 4:00 p.m. He saw them again between 10:00 p.m. and 10:30 p.m. at his apartment complex, the King Frederick Court, in Terrytown *1047 McGrew's girlfriend lived in the same complex, and Baptiste frequently saw McGrew and defendant there. According to Baptiste, McGrew and defendant asked him to drive them home to the Oakdale Subdivision (which is the neighborhood near the E-Z Serve) but that he refused because they both had guns. According to Baptiste, McGrew was carrying a .38 caliber gun and Chattman had a .45 caliber gun. Baptiste said Chattman lived at 505 Bannerwood Street and Baptiste believed McGrew lived at 404 Melbrook Drive.
In October of 1998, Baptiste also told police about a statement defendant made to him after the homicides. According to Baptiste, defendant said that someone had brought him and McGrew to the front of the neighborhood and dropped them off near the E-Z Serve. McGrew and defendant saw "two white guys" who had a "cigar," also known as a "blunt," which Baptiste explained was marijuana. McGrew and defendant smoked the "blunt" with the two young men. According to Baptiste, McGrew and one of the guys got into a confrontation because he did not want to sell McGrew "a bag of weed." Baptiste said Chattman told him that McGrew pulled a gun on the guy and said, "I should jack you." The young man then said, "I just smoked with you. Why you gonna do, you know, do me that?" Baptiste said that Chattman told him McGrew then looked around as if to make sure no one was watching, and then shot the young man. The other young man was "jammed up by a newspaper stand ... begging for his life" when McGrew shot him. According to Baptiste, defendant was surprised when McGrew shot the men.
Matt Schieffler, a former cell mate of defendant's, also testified at trial that defendant told him about the events preceding the shooting when they shared a prison cell together in 1999. According to Schieffler, defendant and a friend were at B.J.'s Pawn Shop in Gretna earlier in the day trying to purchase "guns and bullets they needed." Schieffler testified that defendant told the salesman at the pawn shop that "he needed them for that night." Later, according to Schieffler, defendant and the friend went to the King Fredericks apartments where they were paged by some "guys in Gretna ... by the E-Z Serve ... to make a drug sale ... and, in the process of the sale, the deal went bad and one tried to rip off the other or take their money or the dope, and at that time he told me they pulled their guns out and his friend by his name was McGraw; McGraw or McGrew, I'm not exactly positive of his name, he pulled out the gun and started shooting the two guys." Schieffler said that defendant told him they stopped to talk to some girls they knew, but defendant and the friend fled when they saw the police. He claimed they discarded the guns and eventually split up.
On September 27, 1998, three days after the homicides, McGrew discarded the gun that fired one of the bullets recovered from Savoy's head. McGrew abandoned the gun while running from Detective Chris Fisher of the Jefferson Parish Sheriff's Office as the officer attempted to effect an investigatory stop. McGrew was apprehended at 416 Melbrook, the address of Dalton Baptiste's mother, after defendant had knocked on the door and asked, to no avail, to be let in.
On September 30, 1998, the police executed search warrants on the residences of McGrew and defendant. Lieutenant Pernia testified that some tennis shoes, clothing, and one .45 caliber bullet were seized from defendant's residence. At McGrew's residence, the police seized some tennis shoes, some clothing, and a box of .45 caliber Winchester bullets, which were the *1048 same caliber and the same make as the bullet found at defendant's residence. The state and defense stipulated there was no serological value from the shoes or clothing. Defendant was not at home when the search warrant was executed. However, the police informed his mother that he was wanted in connection with the homicides, and defendant surrendered to the police a week later.

SUFFICIENCY OF THE EVIDENCE
In this assignment, defendant contends that there is insufficient evidence to support his convictions because the only evidence linking him to the murders was the "self-serving" testimony of Dalton Baptiste and Matt Schieffler. Further, defendant contends that neither Baptiste's nor Schieffler's testimony established the necessary element of specific intent.
In reviewing the sufficiency of evidence, an appellate court must determine that the evidence, whether direct or circumstantial, or a mixture of both, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime have been proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Juluke, 98-0341 (La.1/8/99), 725 So.2d 1291.
The requirement of LSA-R.S. 15:438 regarding circumstantial evidence does not establish a standard separate from the Jackson standard, but rather provides a helpful methodology for determining the existence of reasonable doubt. Ultimately, all evidence, both direct and circumstantial, must be sufficient to support the conclusion that the defendant is guilty beyond a reasonable doubt. State v. Jones, 98-842 (La.App. 5 Cir. 2/10/99), 729 So.2d 57.
To prove second degree murder, LSA-R.S.14:30.1(A), the state must show the killing of a human being and that the defendant had the specific intent to kill or inflict great bodily harm. Individuals can be convicted as principals to a crime if they are "concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime." LSA-R.S. 14:24. However, not all principals are automatically guilty of the same grade of offense. An individual may only be convicted as a principal for crimes in which he personally has the requisite mental state, and the intent of the accomplice cannot be imputed to the defendant. State v. Brooks, 505 So.2d 714 (La.1987), cert. denied, 484 U.S. 947, 108 S.Ct. 337, 98 L.Ed.2d 363 (1987).
Specific intent is "that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." LSA-R.S. 14:10(1). Specific intent need not be proven as a fact, but may be inferred from the circumstances and actions of the defendant. State v. Graham, 420 So.2d 1126 (La.1982).
At trial, there was evidence that the defendant was in the vicinity of the crime scene before the murders. Testimony from Rossi Thomas and Keymba Williamson put defendant, along with McGrew, heading toward the E-Z Serve within thirty minutes to an hour of the killings. According to Sidney Williamson's testimony, McGrew and another man were running away from the scene shortly after the killings.
There was also evidence from which the jury could infer defendant's intent to kill or to inflict great bodily harm. First, there is Danny Rees' testimony that, the day of the homicides, defendant and *1049 McGrew attempted to purchase .38 caliber ammunition. Defendant told Rees he needed the ammunition for that night. Also, Dalton Baptiste testified he saw defendant and McGrew armed with guns approximately two hours before the homicides occurred. There is also Schieffler's testimony that both McGrew and defendant "pulled their guns out" and McGrew shot the victims.
Defendant contends that the state failed to negate every reasonable possibility of innocence because the evidence, at best, established that defendant was surprised at McGrew's firing a gun at the victims. However, Louisiana courts recognized that a defendant may possess the requisite intent even though he did not inflict the mortal injury. See State v. Meyers, 95-750 (La.App. 5 Cir. 11/26/96), 683 So.2d 1378, writ denied, 97-0234 (La.6/20/97), 695 So.2d 1350.
In the present case, there is no evidence to show that defendant did anything to prevent McGrew from shooting either victim. Rather, according to Schieffler's testimony, defendant was armed and pulled his own gun on the victims simultaneously with McGrew and fled after the shooting. Further, the fact that defendant was so anxious to purchase ammunition for that night, combined with evidence defendant did not render assistance after the shooting, belies the claim that he was surprised by McGrew's actions.
Defendant also asserts that no rational trier of fact could have believed Schieffler or Baptiste because they were convicted felons facing life sentences, an effective motivation to provide favorable testimony for the state. The record reflects that Schieffler testified he was serving a prison sentence for possession of heroin, and admitted to numerous prior convictions. He acknowledged that he still faced the possibility of a life sentence because the state had filed a multiple bill against him. Further, Schieffler admitted that he hoped the district attorney would withdraw the multiple bill or seek a lesser sentence, but stated that he had no agreement with the state in exchange for favorable testimony. Likewise, Baptiste admitted to two prior convictions, as well as pending drug and theft charges. He also denied that the state had promised leniency in exchange for favorable testimony.
Although defendant asserts that the versions of events told by Baptiste and Schieffler are contradictory, there do not appear to be significant irreconcilable differences between the stories. There are differences, such as Baptiste said the victims smoked marijuana before the shootings, while Schieffler did not mention this detail. But, other evidence corroborates certain aspects of Schieffler's and Baptiste's testimony. For example, Schieffler said that defendant told him McGrew and defendant were at the "King Fredericks" apartment complex earlier that evening, which is the complex where Baptiste saw the defendant and McGrew. Also, Schieffler's testimony that defendant and McGrew attempted to purchase ammunition at B.J.'s pawn shop is corroborated by Danny Rees' testimony. Finally, there is independent evidence to corroborate Schieffler's and Baptiste's account of the events. Lab tests revealed the presence of marijuana in both victims, confirming the testimony regarding drug activity before the shooting. Additionally, Baptiste said McGrew told him that the shooting had occurred by a "store by a pay phone" and that one of the victims was crouched by a newspaper stand after McGrew had shot the first boy. Crime scene photographs depict the two victims lying in pools of blood separated by a pay telephone booth with one of the victims *1050 lying near a Times Picayune newspaper stand.
The trier of fact makes credibility determinations and may, within the bounds of rationality, accept or reject the testimony of any witness; thus, a reviewing court may impinge on the fact finder's discretion only to the extent necessary to guarantee the fundamental due process of law. State v. Howard, 98-0064 (La.4/23/99), 751 So.2d 783, cert. denied, 528 U.S. 974, 120 S.Ct. 420, 145 L.Ed.2d 328 (1999). The jury was presented with evidence that defendant desperately sought to purchase .38 caliber ammunition earlier that day, the same caliber of bullet recovered from Savoy's brain. Testimony was also presented that defendant was armed with a gun and drew his gun on the victims immediately before McGrew fired his gun. In returning the guilty verdict, the jury obviously believed the state's witnesses, including Schieffler and Baptiste. Based on the foregoing, the evidence shows that a rational trier of fact could have believed that the state established the elements of second degree murder beyond a reasonable doubt. Accordingly, this assigned error is without merit.

ADMISSION OF AUTOPSY PHOTOGRAPHS
In his second assigned error, defendant contends that the trial court improperly admitted autopsy photographs of the deceased victims into evidence. Defendant asserts that the photographs had no probative value because the cause of death was not at issue. He further asserts that the autopsy photographs were cumulative of the crime scene photographs, were gruesome, and unduly prejudicial.
In State v. Broaden, 99-2124 (La.2/21/01), 780 So.2d 349, 364, the Louisiana Supreme Court summarized the jurisprudence on the admission of these types of photographs as follows:
The state is entitled to the moral force of its evidence, and post-mortem photographs of murder victims are admissible to prove corpus delicti, to corroborate other evidence establishing cause of death, as well as location and placement of wounds and to provide positive identification of the victim. State v. Koon, 96-1208, p. 34 (La.5/20/97), 704 So.2d 756, 776; State v. Martin, 93-0285, p. 14 (La.10/17/94), 645 So.2d 190, 198. Photographic evidence will be admitted unless it is so gruesome as to overwhelm jurors' reason and lead them to convict without sufficient other evidence. Koon, 96-1208 at p. 34, 704 So.2d at 776, citing State v. Perry, 502 So.2d 543, 558-59 (La.1986), cert. denied, 484 U.S. 872, 108 S.Ct. 205, 98 L.Ed.2d 156 (1987).
The admission of gruesome photographs is not reversible error unless it is clear that their probative value is substantially outweighed by their prejudicial effect. State v. Broaden, supra.
In this case, the photographs in question were admitted in conjunction with the testimony of Dr. Fraser McKenzie who performed the autopsies. The photographs were relevant to show that the manner in which the victims were killed as well as to show that they were shot at close range. We have reviewed the photographs and agree with the trial judge's conclusion that their probative value outweighs any prejudicial effect that might be had against this defendant. Accordingly, this assigned error is without merit.

INCOMPLETE RECORD
By this assignment, defendant claims that he has been denied the right to a fair appeal because the transcript of the hearing to recuse the trial judge is not available. Prior to trial, the state filed a motion to recuse the Honorable Fredericka *1051 Wicker from the case. On May 23, 2001, Judge Rothschild conducted a hearing on this recusal motion, and after taking the matter under advisement, he rendered a written judgment granting the state's motion. This transcript is not contained in the record because according to the court reporter, the recording device failed to record it. Defendant complains that this omission precludes him from effectively challenging Judge Rothschild's ruling on appeal.
Article 873 of the Code of Criminal Procedure provides that the clerk or court stenographer shall record all of the proceedings in felony cases, including the examination of prospective jurors, the testimony of witnesses, statements, rulings, orders, and charges by the court, and objections, questions, statements, and arguments of counsel. In State v. Hoffman, 98-3118 (La.4/11/00), 768 So.2d 542, 586, cert. denied, 531 U.S. 946, 121 S.Ct. 345, 148 L.Ed.2d 277 (2000), the Louisiana Supreme Court set out the standard for reviewing omissions in the appellate record as follows:
Material omissions from the transcript of the proceedings at trial bearing on the merits of an appeal will require reversal. See State v. Robinson, 387 So.2d 1143 (La.1980) (reversal required when record failed to contain the testimony of a State and defense expert witness); State v. Ford, 338 So.2d 107 (La. 1976) (reversal required when record missing the testimony of four State witnesses and the voir dire of prospective jurors). On the other hand, inconsequential omissions or slight inaccuracies do not require reversal. State v. Goodbier, 367 So.2d 356, 357 (La.1979) (reversal not required when record does not include a transcript of the voir dire examination and affidavit of court reporter indicated that counsel made no objections during voir dire).
In State v. Hawkins, 96-0766 (La.1/14/97), 688 So.2d 473, the defendant claimed that his conviction should be reversed because of the lack of transcripts of opening statements, closing arguments and jury instructions. However, the court stated that the presumption of regularity in judicial proceedings in LSA-R.S. 15:534 applied, and rejected defendant's argument, since he could not show any prejudice from the missing transcripts.
In the present case, we find that defendant failed to show that he was prejudiced by the missing transcript. In his appellate brief, defendant alleges that he is prejudiced by the absence of the recusal transcript because it "may be argued that without Judge Wicker presiding over the trial the defense was prejudiced. For example, regarding the admission of the autopsy photos, the minute entry reflects that this was taken under advisement by Judge Wicker and caused confusion as to their admission at trial."
Defendant's assertions are not entirely supported by the record. While the record reflects that Judge Wicker did take the motion regarding the autopsy photographs under advisement on July 21, 1999, the record does not reflect the judge ruled on the motion. Regardless, there was no confusion as to the admission of the photographs at trial because six of them were admitted, over the defense's objection. As discussed in the foregoing assignment, the photographs were not unduly prejudicial and were properly admitted at trial. Defendant fails to even suggest any other way that he has been prejudiced by the absence of the May 23, 2000 transcript. Accordingly, this assigned error is likewise without merit.

ERROR PATENT DISCUSSION
We have also reviewed the record for errors patent, in accordance with LSA-C.Cr.P. *1052 art. 920 and State v. Oliveaux, 312 So.2d 337 (La.1975). Our review reveals a discrepancy between the commitment and transcript. The commitment reflects that the trial court ordered the sentences to be served consecutively, while the transcript reflects that the trial court ordered the sentences to be served concurrently. When there is a discrepancy between the commitment and the transcript, the transcript prevails. State v. Lynch, 441 So.2d 732 (La.1983). Accordingly, we remand the matter with instructions to the trial court to correct the commitment to reflect that the sentences be served concurrently.
For the reasons set forth herein, we affirm defendant's convictions and sentences but remand the matter with instructions to the trial court.
DEFENDANT'S CONVICTION AND SENTENCE AFFIRMED, REMANDED WITH INSTRUCTIONS.
NOTES
[1] The indictment also charged co-defendant Carlos McGrew with two counts of first degree murder. A twelve person jury found McGrew guilty of two counts of second degree murder. The trial court thereafter sentenced him on each count to life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence. This Court, in State v. McGrew, 00-200 (La.App. 5 Cir. 9/27/00), 769 So.2d 782, affirmed McGrew's convictions and sentences.